Case 1:19-cv-01590-SHR Document 41-4 Filed 09/09/20 Page 1 of 38

Auto Equity Loans of Delaware, LLC v. Baird, Not Reported in Atl. Rptr. (2019)

2019 WL 5381915

2019 WL 5381915
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Delaware.

AUTO EQUITY LOANS OF DELAWARE,
LLC, and David Levi, Appellants,
v.
Joseph BAIRD, Appellee
Alton Griffin and Jeannine
Medora, Cross Appellants.

No. N18A-08-001-DCS
|
Submitted: June 12, 2019
|
Decided: September 20, 2019

*Upon Appeal from the Court of Common Pleas*-**REVERSED**
and **REMANDED**, in part; **AFFIRMED**, in part.

**Attorneys and Law Firms**

Vivian A. Houghton, Esquire, Attorney for Appellee and
Cross-Appellants.

Ellis E. Herrington, Esquire, and Douglass D. Herrmann,
Esquire, Attorneys for Appellants.

**OPINION**

STREETT, J.

### Introduction

**\*1**  Joseph Baird, Alton Griffin, and Jeannine Medora
(collectively the "Borrowers") each entered into separate
high interest rate loan agreements with Auto Equity Loans
of Delaware (with David Levi, the owner of Auto Equity
Loans of Delaware, the "Appellants"). Each loan contained
an arbitration provision and a Delaware choice-of-law
provision. [1]

Subsequently, each of the Borrowers filed separate Demands
for Arbitration on the loan agreements, asserting several

claims and requesting that the arbitrator apply Pennsylvania
law. [2]  The arbitrator determined that Pennsylvania law
applied to each loan, found that the loans violated the
applicable Pennsylvania law, and granted an arbitration award
to each Borrower.

Appellants appealed each of the arbitrator's awards to the
Court of Common Pleas (the "reviewing court"). [3]  The
reviewing court consolidated the three petitions. Appellants
asserted that the arbitrator manifestly disregarded the law
when he applied Pennsylvania law instead of Delaware law.

The parties filed cross motions for summary judgment. [4]  The
reviewing court held that the arbitrator manifestly disregarded
the law in applying Pennsylvania law to the Griffin and
Medora loan agreements and vacated the Griffin and Medora
awards. The reviewing court did not make the same holding
regarding the Baird loan agreement. Instead, it affirmed the
Baird award. [5]

Appellants now ask this Court to reverse the reviewing court's
decision concerning the Baird arbitration award (which
upheld application of Pennsylvania law). Appellants are also
asking this Court to affirm the reviewing court's decision to
vacate the Griffin and Medora arbitration awards (which had
been based on Pennsylvania law).

 **\*2**  Ms. Medora and Mr. Griffin (Cross-Appellants) ask this
Court to reverse the reviewing court's decision to vacate their
arbitration awards that had been based on Pennsylvania law.

Mr. Baird asks this Court to affirm the reviewing court's
decision to uphold his arbitration award that had been based
on Pennsylvania law.

For the following reasons, the Court affirms the reviewing
court's decision to uphold the Baird arbitration award and
reverses and remands the decision to vacate the Griffin and
Medora arbitration awards.

### Statement of Facts

Appellants are in the business of making loans secured by
automobiles. Auto Equity Loans of Delaware is a Limited
Liability Company organized under the laws of Delaware,
has offices in Delaware, and is licensed and regulated by
the Delaware State Bank Commissioner. David Levi is

2019 WL 5381915

the owner. At all relevant times, Mr. Baird, Mr. Griffin, and Ms. Medora were Pennsylvania residents, had viewed Appellants' advertisements on the internet, and their vehicles were registered in Pennsylvania.

From 2014 to 2016, Mr. Baird entered into a series of nine loan agreements with Appellants concluding with a Secondary Motor Vehicle Finance Contract Loan and Security Agreement. On July 23, 2015, Mr. Griffin entered into a Secondary Motor Vehicle Finance Contract Loan and Security Agreement with Appellants. On July 15, 2016, Ms. Medora entered into a Secondary Motor Vehicle Finance Contract Loan and Security Agreement with Appellants. [6] Each Borrower travelled individually to Appellants' office in Delaware to sign its loan. Each Borrower's loan was secured by the Borrower's automobile. Each loan agreement stated that it "shall be governed by the laws of the State of Delaware" and that the arbitrator shall apply applicable substantive law consistent with the Federal Arbitration Act.

During the repayment period, each of the Borrowers separately filed Demands for Arbitration with the American Arbitration Association ("AAA"). [7] They each requested that Pennsylvania law apply. John Kelly, Esquire, (the "arbitrator") was selected by the AAA to be the arbitrator. Each Borrower asserted several claims: unconscionability; usury pursuant to Pennsylvania law; a claim pursuant to Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"); and a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim. Ms. Medora and Mr. Baird also asserted a claim under the Truth-in-Lending Act ("TILA"). Ms. Medora and Mr. Griffin later withdrew their unconscionability claims. Ms. Medora also subsequently withdrew her UTPCPL and RICO claims.

On January 24, 2017, the arbitrator held an evidentiary hearing concerning the Medora loan. On March 19, 2017, the arbitrator issued an award in favor of Ms. Medora.

**\*3** On February 2, 2017, the arbitrator held an evidentiary hearing concerning the Griffin loan. On March 23, 2017, the arbitrator issued an award in favor of Mr. Griffin.

On March 8, 2017, the arbitrator held an evidentiary hearing concerning the Baird loan. On March 21, 2017, the arbitrator issued an award in favor of Mr. Baird.

In each decision, the arbitrator found that Pennsylvania substantive law applies and Delaware substantive law did not apply. He relied on *Kaneff v. Delaware Title Loans* [8] and *Gregoria v. Total Asset Recovery, Inc.* [9] (Federal cases) and *Salvatico v. Carbucks of Delaware, Inc.* [10] and *Jaibur v. Auto Equity Loans of Delaware, LLC and David Levi* [11] (Pennsylvania cases). The arbitrator found that the high interest rates charged by Appellants are prohibited by Pennsylvania public policy and the Pennsylvania Loan Interest and Protection Law even though the arbitrator ruled against Mr. Baird's unconscionability claim. The arbitrator also held that Appellants violated TILA, UTPCPL, and RICO.

### Procedural History

Appellants appealed each of the three arbitrator's awards to the Delaware Court of Chancery. On August 15, 2017, the cases were transferred to the reviewing court, pursuant to 10 *Del. C.* § 5702(d), [12] and consolidated. The parties filed cross-motions for summary judgment.

**\*4** Appellants asserted, in its briefs, that the arbitration awards should be vacated. Appellants contended that the arbitrator manifestly disregarded the law when he: (1) ignored the plain terms of the loan agreements and/or failed to perform a choice of law analysis, (2) ignored controlling precedent that he had previously relied upon in a similar 2012 arbitration when he ruled that Delaware law applied, [13] (3) based his decision on claims withdrawn or abandoned [by the Borrowers], (4) disregarded the commerce clause of the United States Constitution, and (5) applied UTPCPL, RICO and TILA retroactively without analysis.

The Borrowers asserted that: (1) the arbitrator properly rejected the Delaware choice-of-law clause in the contracts, (2) the arbitrator did not exceed his authority, (3) an arbitrator's reasonable choice-of-law analysis is beyond the scope of review, (4) the application of Pennsylvania law in these cases did not violate the United States Constitution, and (5) the arbitrator did not retroactively impose new rules of law.

On May 2, 2018, the reviewing court issued its decision. [14] The reviewing court vacated the Griffin and Medora awards and upheld the Baird award. [15]

The reviewing court's decision focused on Appellant's first two claims (that the arbitrator ignored or incorrectly

Auto Equity Loans of Delaware, LLC v. Baird, Not Reported in Atl. Rptr. (2019)

2019 WL 5381915

Case 1:19-cv-01590-SHR   Document 41-4   Filed 09/09/20   Page 3 of 38

applied the choice-of-law analysis and that this decision that Pennsylvania substantive law applied contradicted his decision in a 2012 arbitration). It applied a balancing test between Delaware's connections to the contract, freedom of contract, and sanctity of contract against Pennsylvania's policy against usury. The reviewing court based its decision on the plain language of the loan agreements and choice of law analysis provided in Restatement (Second) of Conflict of Laws § 187 to determine which state has the materially greater interest. [16]

**\*5** The reviewing court stated that "[i]n determining which state has a materially greater interest under § 187 the Court refers to Restatement (Second) of Conflict of Laws § 188." Restatement (Second) of Conflict of Laws § 188 reads:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in [Restatement (Second) of Conflict of Laws] § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties.

The Court evaluates the contacts based on their relative importance with each particular issue. [17]

Additionally, the factors listed in § 188 are to be considered "in light of" Restatement (Second) of Conflict of Laws § 6(2) which lists several policy interests: [18]

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied. [19]

In applying the § 188 factors, the reviewing court found that Delaware law applied based on Delaware's "materially greater interest" in the action because the Borrowers "travelled to Delaware and visited [Appellants'] office in Delaware, signed the contract and pledged their Pennsylvania titled vehicles as collateral while at the Delaware location, and received the loan while at that Delaware location." [20] It determined that the "important contacts outlined in § 188 ... balance in [Appellants'] favor." [21]

As such, the reviewing court found that the Griffin and Medora arbitration awards were in "direct contradiction to the express terms of the agreement[s] of the parties" and that the arbitrator's choice-of-law analysis was "clearly erroneous." While the reviewing court acknowledged that something "more" than grave legal error on the part of the arbitrator is required to vacate an arbitration award, it found that this case involved something "more" – "the arbitrator's reliance on inapplicable case law despite the extensive briefing by the parties regarding the appropriate analysis for a choice-of-law question, and the arbitrator's statements in his current and prior arbitration awards regarding Delaware versus Pennsylvania choice-of-law issues." [22] The reviewing court held that "[t]hese contextual parameters evidence that the arbitrator was 'cognizant' of controlling law and willfully disregarded the law." [23]

**\*6** The reviewing court did not vacate the Baird award. The reviewing court appears to have distinguished Mr. Baird's case on the ground that he had not withdrawn his unconscionability claim. [24]

**Parties' Contentions**

Auto Equity Loans of Delaware, LLC v. Baird, Not Reported in Atl. Rptr. (2019)
2019 WL 5381915

Case 1:19-cv-01590-SHR   Document 41-4   Filed 09/09/20   Page 4 of 38

Appellants contend that the reviewing court should have vacated the Baird arbitration award when it vacated the Griffin and Medora awards. Appellants argue that the Baird case is indistinguishable from the Griffin and Medora cases and the reviewing court failed to explain why it reached a different conclusion concerning the Baird award. Appellants also assert that the reviewing court correctly reversed the Griffin and Medora arbitration awards because "Delaware had a materially greater interest in the transaction than Pennsylvania" and that the arbitrator had erroneously applied Pennsylvania law. [25] Appellants claim that "if parties transact in Delaware, other states, including Pennsylvania, may not regulate, or interfere with, that transaction." [26]

Appellants additionally contend that the Commerce Clause of the U.S. Constitution bars application of Pennsylvania law to a transaction in Delaware that is governed by Delaware law.

Cross Appellants (Mr. Griffin and Ms. Medora) contend that the reviewing court committed error when it vacated their awards. They argue that the arbitrator correctly applied Pennsylvania law and Appellants have not established that the arbitrator manifestly disregarded the law.

Appellee (Mr. Baird) asserts that the reviewing court's decision affirming his award was correct and should be affirmed.

As such, this Court will discuss whether the reviewing court correctly held that the arbitrator manifestly disregarded the law concerning the Griffin and Medora contracts and whether its decision concerning the Baird contract was inconsistent. [27]

### Standard of Review

Pursuant to 10 *Del. C.* § 1326(a), a party may appeal "any final order, ruling, decision, or judgment of the [Court of Common Pleas] in a civil action" to the Superior Court. [28] As to arbitration awards, under 10 *Del.C.* § 5719 [29] an appeal may be taken from a final order confirming or vacating an award and "[t]he appeal shall be taken in the manner and to the same extent as from orders or judgments in a civil action."

**\*7**  This Court is an intermediate appellate court. [30] This Court's role is limited to determining "whether there is legal error, whether the trial court's factual findings are sufficiently supported by the record, and whether those findings are

the product of an orderly and logical reasoning process." [31] Conclusions of law are reviewed *de novo.* [32] "The decision of the Court of Common Pleas granting summary judgment presents a question of law that is entitled to *de novo* review by this Court." [33]

As such, it will review the Court of Common Pleas' decision concerning the instant arbitration awards pursuant to 10 *Del. C.* § 5702(d) which confers jurisdiction on the Court of Common Pleas to enforce an agreement and to enter judgment on an arbitration award on actions arising from the extension of consumer credit.

### Discussion

In this appeal, the Court's examination of the reviewing court's decision will be *de novo.* [34] "Whether the grant or denial of a motion for summary judgment is proper presents a question of law" [35] and the parties assert that the reviewing court erred in applying the law. Where the issue on appeal is a matter of law, this Court must determine whether the reviewing court "erred in formulating or applying legal precepts." [36]

Here, it is not this Court's role to determine whether Delaware law or Pennsylvania law applies to the three contracts. [37] This Court's role is to determine whether the reviewing court (1) committed legal error when it granted summary judgment for Appellants (vacating the Griffin and Medora awards); and (2) whether the reviewing court committed legal error when its decision concerning the Baird case differed from its conclusion in the Griffin and Medora cases. For the following reasons, the Court finds that vacatur of the Griffin and Medora awards was error and it was not error to uphold the Baird award. [38]

**\*8**  When a party is seeking to vacate an arbitration award, the Federal Arbitration Act [39] and the Delaware Uniform Arbitration Act [40] "require reviewing courts to give practically the highest degree of deference, short of 'untouchable,' recognized in the law to an arbitrator's award." [41] "Indeed, to overturn an award, the court must be satisfied that there is absolutely no support at all in the record justifying the arbitrator's determinations." [42] The Delaware Supreme Court has held that "review of an arbitration

Case 1:19-cv-01590-SHR   Document 41-4   Filed 09/09/20   Page 5 of 38
Auto Equity Loans of Delaware, LLC v. Baird, Not Reported in Atl. Rptr. (2019)
2019 WL 5381915

award is one of the narrowest standards of judicial review in all of American jurisprudence," [43] and the Delaware Chancery Court has referred to the prospect of overturning an arbitrator's award as climbing a "nearly vertical mountain." [44]

The law is clear that the arbitrator is not required to explain his analysis. [45] Moreover, ambiguity in an arbitration opinion [46] and an arbitrator's legal error (without more) are not proper grounds for vacatur. [47] Indeed, "[i]t is recognized that inaccuracies as to the law or facts [made by the arbitrator] are possible and their existence is accepted implicitly by an agreement to submit the dispute to arbitration." [48] Furthermore, there is a presumption that the arbitrator did not exceed his authority [49] and "the court must resolve all doubts in favor of the arbitrator." [50]

**\*9** Under the Federal Arbitration Act ( 9 U.S.C. § 10) and the Delaware Uniform Arbitration Act (10 Del. C. § 5714(3)), one of the circumstances where vacatur is appropriate is when "the arbitrator acts in 'manifest disregard' of the law." [51] The manifest disregard standard requires that the arbitrator was "fully aware of the existence of a clearly defined governing legal principle but refused to apply it, in effect, ignoring it." [52] To meet this standard, the party seeking vacatur must prove "that the arbitrator (1) knew of the relevant legal principle, (2) appreciated that this principle controlled the outcome of the disputed issue, and (3) nonetheless willfully flouted the governing law by refusing to apply it." [53]

Here, although the reviewing court acknowledged the great deference given to arbitrator's awards, it held that the Restatement (Second) of Conflict of Laws § 187 choice-of-law analysis (adopted by Delaware courts) is the governing law and the Delaware contacts listed in Restatement (Second) of Conflict of Laws § 188 outweighed Pennsylvania contacts thereby requiring the application of Delaware's policy of enforcing (arguably usurious) contracts. It also held that the evidence shows that the arbitrator knew of the choice-of-law analysis (based on briefs submitted by the parties), appreciated that Delaware law controlled the issue in the instant case, [54] and willfully flouted the law when the arbitrator based his decision on cases (Kaneff, Gregoria, Salvatico, and Jaibur) that the reviewing court deemed inapplicable.

However, the Delaware Supreme Court has held that "[a]n arbitrator's awareness of the contract language,... does not prove that the arbitrator knew of the relevant legal principle or appreciated that this principle controlled the outcome of the dispute." [55] Moreover, "[a] reviewing court is not to pass an independent judgment on the evidence or applicable law submitted to the arbitrator." [56] Thus, even if the arbitrator committed legal error in applying Kaneff, Gregoria, Salvatico, and Jaibur, [57] an arbitrators' failure to understand the law is an insufficient reason to vacate an arbitration award. [58]

**\*10** Furthermore, the record does not support a determination that the arbitrator willfully flouted the law in these 2017 arbitration decisions based on a decision in an unrelated arbitration where he reached a different result five years prior to this case. Here, the arbitrator explained in each of these arbitration decisions that Gregoria, Salvatico, and Jaibur (all decided after his 2012 decision) influenced his understanding that Pennsylvania law would apply in these situations. [59] The arbitrator applied his understanding of controlling law as he believed it to exist in 2017.

As such, the arbitrator's explanation evinced an attempt to follow what he believed was the controlling law. There is a presumption that the arbitrator did not manifestly disregard the law when making this determination. [60] Furthermore, the reviewing court was required to resolve all doubts in favor of the arbitrator, and no evidence was presented to show that the arbitrator was disingenuous when he explained how he reached a conclusion in the Griffin and Medora cases that differed from his conclusion in an unrelated 2012 case. [61]

An arbitrator's determinations is not to be overturned unless "there is absolutely no support at all in the record justifying [those] determinations." [62] In the instant case, there is some support in the record for the arbitrator's determination that Pennsylvania law applied. [63] Here, the Borrowers presented legal authority (Kaneff, Gregoria, and 41 P.S. § 408) that favored the application of Pennsylvania law and the facts of those cases were similar. [64] When considering Pennsylvania's fundamental policy against usury, the courts in Kaneff and Gregoria undertook a choice-of-law analysis under Restatement (Second) of Conflict of Law § 187 on similar contracts and concluded that Pennsylvania had a materially greater interest. [65]

Case 1:19-cv-01590-SHR Document 41-4 Filed 09/09/20 Page 6 of 38

Auto Equity Loans of Delaware, LLC v. Baird, Not Reported in Atl. Rptr. (2019)

2019 WL 5381915

**\*11** As such, concerning the Griffin and Medora agreements, the standard for vacating an arbitrator's award, as stated by the Delaware Supreme Court, has not been met. It has not been established that the arbitrator appreciated that a governing law controlled the outcome of the disputed issue and, nevertheless, willfully flouted that law by refusing to apply it to the Griffin and Medora loan agreements.

Concerning the Baird agreement, the reviewing court did not conclude that the arbitrator manifestly disregarded the law when he applied Pennsylvania law to the Baird loan agreement. [66] Appellants failed to provide any evidence that overcomes the presumption that the arbitrator acted within his authority when he concluded that Pennsylvania law applies to the Baird loan agreement. [67] This Court finds that there was some support in the record for the arbitrator's determination that Pennsylvania law applies and Appellants did not present evidence showing that the arbitrator willfully flouted the governing law. As such, this Court finds that the reviewing court did not commit error in upholding the Baird arbitration award.

While it is clear that the reviewing court gave great consideration to the issues and identified several reasons why it disagrees with the arbitrator's choice of law, this Court does not find that the arbitration awards were the product of manifest disregard of the law. Vacatur of the Griffin and Medora arbitration awards was error and affirmance of the Baird award was not error.

## Conclusion

Accordingly, the Court of Common Pleas' decision granting summary judgment to Appellants and vacating the arbitration awards of Mr. Griffin and Ms. Medora is **REVERSED** and the matter is **REMANDED** for proceedings consistent with this opinion. The decision upholding the arbitration award to Mr. Baird is **AFFIRMED.**

**IT IS SO ORDERED.**

## All Citations

Not Reported in Atl. Rptr., 2019 WL 5381915

## Footnotes

1  The loan agreements stated that any dispute is governed by the Federal Arbitration Act.

2  Mr. Baird asserted claims of unconscionability, Pennsylvania Loan Interest and Protection Law ("PLIPL"), Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), Truth in Lending Act ("TILA"), and Racketeer Influenced and Corrupt Organizations Act ("RICO"). Mr. Griffin asserted claims under PLIPL, UTPCPL, and RICO (he withdrew an unconscionability claim). Ms. Medora asserted claims under PLIPL and TILA (she withdrew her unconscionability, UTPCPL, and RICO claims).

3  Appellants originally filed in the Delaware Court of Chancery and was transferred to the reviewing court.

4  Appellants moved for judgment to vacate the three awards and the Borrowers moved for judgment to affirm the three awards. The reviewing court granted in part and denied in part Appellants' motion (granted on the Griffin and Medora awards and denied on the Baird award) and granted in part and denied in part Borrowers' motion (granted on the Baird award and denied on the Griffin and Medora awards).

5  The reviewing court did not fully explain why it upheld the Baird arbitration award, which had a Delaware choice-of-law provision, even though the court found that the Baird loan agreement had the same connections to Delaware as the Griffin and Medora loan agreements.

6  The Borrowers assert that the Baird loan was $2,025.00 with an approximately 180% A.P.R.; the Griffin loan was $3,590.00 with an approximately 121.67% A.P.R., and the Medora loan was $390.00 with an approximately 242.35% A.P.R.

7  On April 29, 2016, Mr. Griffin filed his Demand for Arbitration. On July 29, 2016, Ms. Medora filed her Demand for Arbitration. On October 24, 2016, Mr. Baird filed his Demand for Arbitration.

Auto Equity Loans of Delaware, LLC v. Baird, Not Reported in Atl. Rptr. (2019)

Case 1:19-cv-01590-SHR   Document 41-4   Filed 09/09/20   Page 7 of 38

2019 WL 5381915

8   *Kaneff v. Delaware Title Loans*, F.3d 616, 624 (3rd Cir. Nov. 24, 2009) (In deciding on the procedural issue of whether an arbitration provision should be enforced, where the plaintiff was claiming that the entire contract was unconscionable, the Third Circuit held that "Pennsylvania's interest in the dispute, particularly its antipathy to high interest rates... represents ... a fundamental policy that [it] must apply Pennsylvania law.").

9   *Gregoria v. Total Asset Recovery, Inc.*, 2015 WL 115501 (E.D. Pa. Jan. 8, 2015) (Citing *Kaneff*, the District Court overruled the Delaware choice-of-law provision in the contract and applied Pennsylvania law because Pennsylvania's law against usury is a fundamental policy).

10  *Salvatico v. Carbucks of Delaware, Inc.*, C.A. No. 2006-00971 (CCP Bucks Co. Pa., Oct. 24, 2013) (In an Order, without a written opinion, the Bucks County Court of Common Pleas ruled that Pennsylvania law applied to loans made by a Delaware auto title lender).

11  *Jaibur v. Auto Equity Loans of Delaware, LLC and David Levi*, C.A. No. CCP Bucks Co. Pa. June 30, 2016) (Without providing a written opinion, the Bucks County Court of Common Pleas issued an Order denying the Delaware Lender's Preliminary Objection to the Pennsylvania Borrower's complaint which asserted that Pennsylvania law applies).

12  10 *Del. C.* § 5702(d):

    Notwithstanding anything to the contrary in this Chapter 57 of this title, the term "Court" in this chapter shall refer to the Court of Common Pleas with respect to all actions arising from an arbitration agreement in or relating to a contract to provide consumer credit, and the making of such an agreement to arbitrate issues arising from the extension of consumer credit shall confer jurisdiction on the Court of Common Pleas, and not the Court of Chancery, to enforce the agreement and to enter judgment on an award. Any action brought under this Chapter 57 of this title relating to an agreement to arbitrate issues arising from the extension of consumer credit filed in the Court of Chancery shall not therefore be dismissed, but shall be transferred to the Court of Common Pleas for resolution there as though filed originally in that Court.

13  In a 2010 matter, involving the issue of whether Delaware law or Pennsylvania law applies in a dispute concerning a high interest loan agreement, the same arbitrator found that Pennsylvania law applies pursuant to *Kaneff*. However, in a 2012 case on the same issue, the same arbitrator found that Delaware law, and not Pennsylvania law, applied, finding that *Kaneff* applied to procedural law and not necessarily to substantive law. The arbitrator explained that his "thinking and reasoning have evolved." In the instant case, the arbitrator explained that subsequent cases (*Gregoria*, *Salvatico*, and *Jaibur*) indicate that Pennsylvania substantive law as well as its procedural law applies to cases involving high interest rates in loan agreements with Pennsylvania borrowers.

14  The reviewing court granted in part and denied in part Appellants' motion for summary judgment and granted in part and denied in part the Borrowers' motion for summary judgment.

15  The reviewing court found that Appellants' Commerce Clause claim lacked merit because Appellants did not cite any cases and the Court did not find a case where the Commerce Clause was applied to an arbitrator's choice-of-law decision. "In fact, the case [Appellants] rel[ied] on, [*Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010)] notes – in the context of a state requiring state licensing if a territorial component to the lending occurred - that the commerce clause does not prevent a choice-of-law analysis." *Auto Equity Loans of Delaware, LLC v. Baird*, 2018 WL 2059939, at *7 n.64 (Del. CCP. May 2, 2018). The reviewing court also noted that Appellants "failed to present the Court with evidence that the arbitrator consciously disregarded controlling precedent, and ... finds in [Borrowers'] favor regarding [the Commerce Clause claim]." *Id.* The reviewing court also found that Appellants failed to show that the arbitrator retroactively applied UTPCPL, RICO, and TILA. *Id.*

16  Here, the loan agreements specified that Delaware law to apply. However, Restatement (Second) of Conflict of Laws § 187(2)(b) states that a choice of law provision will generally be upheld unless "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."

The reviewing court found that Pennsylvania had a fundamental policy against usury while Delaware had a policy to uphold contracts and, therefore, it was required to determine which state had a materially greater interest in the action.

17    Restatement (Second) of Conflicts of Law § 188.

18    *Travelers Indemnity Company v. CNH Industrial America, LLC*, 2018 WL 3434562, at *6 (Del. Ch. July 16, 2018).

19    Restatement (Second) of Conflicts of Law § 6(2).

20    🚩 *Auto Equity Loans of Delaware, LLC v. Baird*, 2018 WL 2059939, at *11 (Del. CCP. May 2, 2018).

21    *Id.* The reviewing court found that the "negotiation, performance, and execution of the loan occurred in Delaware." The reviewing court also stated that Delaware has a public policy as "a contracting haven." *Id.*

22    *Id.*
      The reviewing court stated:
      I find *Kaneff, Gregoria, Salvatico*, and *Jaibur* inapplicable to Respondents Medora and Griffin's arbitration awards. *Kaneff* engaged in a *procedural* choice-of-law analysis for an unconscionability claim and *Gregoria* cited *Kaneff* in its choice-of-law analysis. Further, in *Gregoria*, the United States District Court of the Eastern District of Pennsylvania dismissed the Fair Debt Collection Practice Act claim and required the plaintiff to file an amended complaint to join a necessary party. Neither case is applicable to Respondent Medora or Respondent Griffin. Whereas Respondent Baird asserted an unconscionability claim during the arbitration proceedings and the arbitrator ruled on that claim, Respondents Medora and Griffin withdrew their unconscionability claims. Furthermore, Respondents' reliance on *Salvatico* and *Jaibur* is misplaced, as these cases were judicial orders which did not involve adequate analysis.

      🚩 *Auto Equity Loans of Delaware, LLC v. Baird*, 2018 WL 2059939, at * 14 (Del. CCP. May 2, 2018) (emphasis in the original).

23    *Id.*

24    The reviewing court does not specifically state whether Delaware law or Pennsylvania law should have applied to the Baird loan agreement, however, the reviewing court pointed out that *Kaneff* involved an unconscionability claim and that Griffin and Medora had withdrawn their unconscionability claims.

25    Appellants' Opening Brief, at 14.

26    Appellants' Answer, at 24.

27    Concerning the Griffin and Medora agreements, this Court's task is to examine whether the reviewing court made a legal error in holding that the arbitrator manifestly disregarded the law in applying Pennsylvania law to their contracts. The manifest disregard standard requires a showing that the arbitrator was "fully aware of the existence of a clearly defined governing legal principle but refused to apply it, in effect, ignoring it." *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. June 24, 2014). Concerning the Baird agreement, this Court's task is to review whether the reviewing court made a legal error in not holding the same.

28    10 *Del. C.* § 1326(a) ("From any final order, ruling, decision or judgment of the court in a civil action there shall be the right of appeal to the Superior Court of the State in the county in which said order, ruling, decision or judgment was rendered"). *See also* *Anderson v. R.A. Midway Towing*, 2006 WL 1971806, *2 (Del. Jul. 14, 2006)* ("The Superior Court has statutory authority to decide appeals from decisions of the Court of Common Pleas") (citing 10 *Del. C.* § 1326).

29    10 *Del.C.* § 5719 states:
      (a) Appeals may be taken from:
          (1) A final order denying a complaint seeking to compel arbitration made under § 5703(a) of this title;
          (2) An order granting an application to enjoin arbitration made under § 5703(b) of this title;
          (3) A final order confirming or denying confirmation of an award;
          (4) A final order modifying or correcting an award;
          (5) A final order vacating an award without directing a rehearing; or
          (6) A final judgment or decree entered pursuant to the provisions of this chapter.

(b) The appeal shall be taken in the manner and to the same extent as from orders or judgments in a civil action.

30    *Walls v. Burton*, 2019 WL 458894, at *1 (Del. Super. Feb. 6, 2019); *Id.*

31    *Hicklin v. Onyx Acceptance Corp.*, 970 A.2d 244, 248 (Del. 2009).

32    *Davis v. Frontier Communications*, 2012 WL 1413490, *1 (Del. Super. Jan. 4, 2012).

33    *Walls v. Burton*, 2019 WL 458894, at *1 (Del. Super. Feb. 6, 2019).

34    The parties do not claim that there are material factual disputes and they "implicitly concede[d] the absence of material factual disputes and acknowledge[d] the sufficiency of the record to support their respective motions" when they filed cross-motions for summary judgment to the reviewing court. *Gillespie v. Chelsea on Square Apartments*, 2010 WL 3386553, at *3 (July 30, 2010). In reviewing the record, this Court does not find the existence of a material factual dispute.

35    *Newtowne Village Service Corp. v. Newtowne Road Development Company, Inc.*, 772 A.2d 172, 174-75 (Del. May 2, 2001).

36    *Id.*

37    Arguably, Pennsylvania law could apply based on Pennsylvania's fundamental policy against usury and on interstate advertising, origin of payments, and location of the vehicles.

38    The Court also finds that the reviewing court did not commit error when it concluded, in a footnote, that Appellants' Commerce Clause claim lacks merit. As the reviewing court noted, Appellants failed to present any evidence that the arbitrator consciously disregarded controlling precedent concerning Appellants' Commerce Clause claim and Appellants did not cite any cases applying the Commerce Clause to an arbitrator's choice-of-law decision. In addition, Appellants' argument that the arbitrator violated the Commerce Clause by applying Pennsylvania law to a contract governed by Delaware law is misplaced. Appellants' claim rests on the assertion that Delaware law applies because Delaware, purportedly, had more contacts with the loan agreements. However, Delaware's choice-of-law analysis requires more than adding up which state has the most contacts. *See GTE Mobilenet Inc. v. Nehalem Cellular, Inc.*, 1994 WL 116194, at *3 (Del. Ch. Mar. 17, 1994). *See also* Restatement (Second) of Conflict of Law § 188 (2) ("These contacts are to be evaluated according to their relative importance with respect to the particular issue."). In fact, in this case, Delaware law required that the fundamental policy of Pennsylvania be taken into account. *See* Restatement (Second) of Conflict of Law § 187(2)(b). Moreover, Delaware allows parties to contract for arbitration and recognizes that the parties enter an arbitration contract aware that arbitrators may make mistakes in applying Delaware laws.

        *See* E.I. DuPont de Nemours and Company v. Custom Blending International, Inc., 1998 WL 842289, at *5 (Del. Ch. Nov. 24, 1998).

39    Under 9 U.S.C. § 10(a) of the Federal Arbitration Act, an arbitration award may be vacated:

        (1) where the award was procured by corruption, fraud, or undue means;

        (2) where there was evident partiality or corruption in the arbitrators, or either of them;

        (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

        (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

40    Under 10 *Del. C.* § 5714(a) of the Delaware Uniform Arbitration Act, an arbitration award shall be vacated where:

        (1) The award was procured by corruption, fraud or other undue means;

        (2) There was evident partiality by an arbitrator appointed as a neutral except where the award was by confession, or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;

        (3) The arbitrators exceeded their powers, or so imperfectly executed them that a final and definite award upon the subject matter submitted was not made;

Auto Equity Loans of Delaware, LLC v. Baird, Not Reported in Atl. Rptr. (2019)

Case 1:19-cv-01590-SHR   Document 41-4   Filed 09/09/20   Page 10 of 38

2019 WL 5381915

(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor, or refused to hear evidence material to the controversy, or otherwise so conducted the hearing, contrary to the provisions of § 5706 of this title, or failed to follow the procedures set forth in this chapter, so as to prejudice substantially the rights of a party, unless the party applying to vacate the award continued with the arbitration with notice of the defect and without objection; or

(5) There was no valid arbitration agreement, or the agreement to arbitrate had not been complied with, or the arbitrated claim was barred by limitation and the party applying to vacate the award did not participate in the arbitration hearing without raising the objection;

but the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award.

41    *Carl Zeiss Vision, Inc. v. Refac Holdings, Inc.*, 2017 WL 3635568, at *4 (Del. Ch. Aug. 24, 2017).

42    *Id.* at *4.

43    *SPX Corp. v. Garda USA*, 94 A.3d 745, 750 (Del. June 24, 2014).

44    *Carl Zeiss Vision, Inc. v. Refac Holdings, Inc.*, 2017 WL 3635568, at *1 (Del. Ch. Aug. 24, 2017).

45    *Carl Zeiss Vision, Inc. v. Refac Holdings, Inc.*, 2017 WL 3635568, at *5 (Del. Ch. Aug. 24, 2017) ("Even if the arbitrator did not state the grounds for a grant or denial of relief, the grant or denial of relief will be deemed to be within the scope of the arbitrator's authority if grounds for the award can be inferred from the facts of the case.") (brackets removed).

46    *TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Securities, Inc.*, 953 A.2d 726, 732 (Del. Ch. July 24, 2008) ("there is a presumption that the arbitration panel acted within the scope of its authority, and this presumption may not be rebutted by an ambiguity in a written opinion") (internal quotation marks removed).

47    *Blank Rome, LLP v. Vendel*, 2003 WL 21801179, at *7 (Del. Ch. Aug. 5, 2003) ("Factual or legal errors, without more, are not sufficient bases to vacate an arbitration award.").

48    *E.I. DuPont de Nemours and Company v. Custom Blending International, Inc.*, 1998 WL 842289, at *5 (Del. Ch. Nov. 24, 1998).

49    *Government Employees Insurance Company v. Progressive Direct Insurance Company*, 2016 WL 6477026, at *3 (Del. Ch. Nov. 2, 2016) ("[T]here is a presumption that the arbitration panel acted within the scope of its authority, and this presumption may not be rebutted by an ambiguity in a written opinion. [I]f any grounds for the award can be inferred from the record, the Court must presume that the arbitrator did not exceed his authority and the award must be upheld.") (internal quotation marks removed) (brackets in the original).

50    *CPL* *Toxicology, Inc. v. Casla Bio Holdings LLC*, 2019 WL 1233458, at *1 (Del. Ch. Feb. 18, 2019); *Carl Zeiss Vision, Inc. v. Refac Hldgs., Inc.*, 2017 WL 3635568, at *5 (Del. Ch. Aug. 24, 2017) (quoting *TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Sec., Inc.*, 953 A.2d 726, 732 (Del. Ch. 2008) (internal quotation marks removed).

51    *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. June 24, 2014) (arbitrators exceed their powers when they manifestly disregard the law).

Here, although the loan agreements state that the Federal Arbitration Act governs any dispute, the reviewing court cited the Delaware Uniform Arbitration Act in vacating the award. However, the reviewing court noted that "[t]he applicable standard for vacating an award under both the Federal Arbitration Act and [Delaware Uniform Arbitration Act] is 'manifest disregard.' " *Auto Equity Loans of Delaware, LLC v. Baird*, 2018 WL 2059939, at *14 (Del. CCP. May 2, 2018). Therefore, the analysis is the same under both acts. *See SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. June 24, 2014).

52    *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. June 24, 2014).

53    *Id.*

In *Carl Zeiss Vision, Inc. v. Refac Holdings, Inc.*, the Chancery Court provides further guidance on the standard required for vacating an arbitrator's award:

When considering whether the arbitrator exceeded its authority, the court must resolve all doubts in favor of the arbitrator. Even if the arbitrator did not state the grounds for a grant or denial of relief, the grant or

Case 1:19-cv-01590-SHR  Document 41-4  Filed 09/09/20  Page 11 of 38

Auto Equity Loans of Delaware, LLC v. Baird, Not Reported in Atl. Rptr. (2019)

2019 WL 5381915

denial of relief will be deemed to be within the scope of the arbitrator's authority if grounds for the award can be inferred from the facts of the case. This court will not pass an independent judgment on the evidence or applicable law, and *if any grounds* for the award can be inferred from the facts on the record, the Court *must* presume that the arbitrator did not exceed his authority and the award must be upheld.

*Carl Zeiss Vision, Inc. v. Refac Holdings, Inc.*, 2017 WL 3635568, at *5 (Del. Ch. Aug. 24, 2017) (internal quotation marks removed) (internal brackets removed).

54    The reviewing court found that the arbitrator appreciated that the choice-of-law was the controlling law because in the 2012 arbitration award decision he had found that it required the application of Delaware law.

55    *SPX Corporation v. Garda USA, Inc., 94* A.3d 745, 750-51 (Del. June 24, 2014).

56    *Pocket Change Kahunaville, Inc. v. Kahunaville of Eastwood Mall, Inc.*, 2003 WL 1791874, at *3 (Del. Ch. Mar. 21, 2003). *See also Wolfe v. Holman*, 2012 WL 863805, at *1, n. 8 (Del. Ch. Mar. 13, 2012); *TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Securities, Inc.*, 953 A.2d 726, 733 (Del. Ch. July 24, 2008); *Audio Jam, Inc. v. Fazelli*, 1997 WL 153814, at *1 (Del. Ch. Mar. 20, 1997).

57    Although, arguably, those cases had sufficient similarities. In *Kaneff* and *Gregoria* Pennsylvania borrowers travelled to Delaware to sign auto title loans, the loans charged high interest rates, the lenders were located in Delaware, and the agreements had a Delaware choice-of-law provision. There are also similar issues (whether Pennsylvania law or Delaware law applies to the high interest rate loans, whether a Delaware choice-of-law provision precludes the application of Pennsylvania law, and whether Pennsylvania's law against usury provides it with a materially greater interest). The court in *Kaneff* also stated that it engaged in a choice-law-analysis under Restatement (Second) of Conflict in Laws § 187 which is the analysis that the reviewing court in the instant case deemed to be the proper analysis. Furthermore, in holding that Pennsylvania's policy against usury is a materially greater interest, *Kaneff* does not preclude application of its holding to substantive law on claims other than an unconscionability claim. Indeed, *Gregoria* broadly interpreted *Kaneff* as "overruling the choice of law provision in [a] contract finding that Pennsylvania's antipathy to high interest rates ... represents such a fundamental policy that we must apply Pennsylvania law."

*Gregoria v. Total Asset Recovery, Inc.*, 2015 WL 115501, at *4 (Although the contract had a Delaware choice-of-law provision, the court decided to "apply Pennsylvania law to interpret the loan agreement" because "the same policy against usurious interest rates [as in *Kaneff*] is implicated.") (internal quotation marks removed).

58    *Viacom International, Inc. v. Winshall*, 2012 WL 3249620, at *11 (Del. Ch. Aug. 9, 2012) ("A court's role in reviewing the outcome of the arbitration proceedings is not to correct factual or legal errors made by an arbitrator... In other words, to vacate the award the court must find something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.") (internal quotation marks removed).

59    In the arbitration awards, the arbitrator stated: "Applying *Kaneff, Gregoria, Jabur* [sic] and *Salvatico*, Pennsylvania, not Delaware substantive law applies to this loan transaction. I recognize that in a similar case deciding the same issue I held that Delaware law applied. However, that decision was prior to the *Gregoria, Jabur* [sic] and *Salvatico* decisions interpreting *Kaneff*."

60    *TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Securities, Inc.*, 953 A.2d 726, 732 (Del. Ch. July 24, 2008) ("there is a presumption that the arbitration panel acted within the scope of its authority, and this presumption may not be rebutted by an ambiguity in a written opinion") (internal quotation marks removed).

61    *Carl Zeiss Vision, Inc. v. Refac Holdings, Inc.*, 2017 WL 3635568, at *5 (Del. Ch. Aug. 24, 2017) ("[T]he court must resolve all doubts in favor of the arbitrator.") (internal quotation marks removed).

62    *Carl Zeiss Vision, Inc. v. Refac Holdings, Inc.*, 2017 WL 3635568, at *4 (Del. Ch. Aug. 24, 2017).

63    *GTE Mobilenet Inc. v. Nehalem Cellular, Inc.*, 1994 WL 116194, at *3 (Del. Ch. Mar. 17, 1994). *See also* Restatement (Second) of Conflict of Law § 188 (2): "These contacts are to be evaluated according to their relative importance with respect to the particular issue."

Auto Equity Loans of Delaware, LLC v. Baird, Not Reported in Atl. Rptr. (2019)

Case 1:19-cv-01590-SHR   Document 41-4   Filed 09/09/20   Page 12 of 38

2019 WL 5381915

In the instant case, although the reviewing court found that several factors favored Delaware, including that the negotiation and place of contracting occurred in Delaware, the Restatements state that "[s]tanding alone, the place of contracting is a relatively insignificant contact" while the place of negotiation "is a significant contact." Restatement (Second) of Conflict of Laws § 188, Comment 2. Here, the place of performance was arguably split between Delaware and Pennsylvania (because the loan appears to have been disbursed in Delaware and the payments on interest were to be paid by the Borrowers who resided in Pennsylvania; in addition, Mr. Griffin's vehicle, which was collateral for the loan, was repossessed in Pennsylvania). *See*

*Clark Equipment Company v. Liberty Mutual Insurance Company*, 1994 WL 466325, at *2 (Del. Super. Aug. 1, 1994) (The court found that the place of performance was both Michigan and Illinois because the insured mailed premiums to the insurers in Chicago, Illinois and the insurers mailed payment for claims to Buchanan, Michigan); *Buhl Building, L.L.C. v. Commonwealth Land Title Insurance Company*, 2019 WL 3916615 (Del. Super. Aug. 19, 2019) (The court found that Michigan law was the place of performance, in part, because the party paid its premiums from Michigan). See also Restatement (Second) of Conflict of Law § 188, Comment 2 ("the state where performance is to occur has an obvious interest in the question whether this performance would be illegal."). The location of the subject matter factor applies when "the contract deals with a specific physical thing, such as land, or chattel, or affords protection against a localized risk," neither of which is present here. *Clark v. Equipment Co. v. Liberty Mutual Insurance Co.*, 1994 WL 466325, at * 3 (Del. Super. Aug. 1, 1994). Lastly, Borrowers were residents of Pennsylvania while Auto Equity Loans was incorporated in Delaware, splitting the final § 188 factor.

64    In addition to arguing that *Kaneff* and *Gregoria* hold that Pennsylvania law applies, the Borrowers also pointed out that under Pennsylvania statute. 41 P.S. § 408 states "[n]otwithstanding any other law, [the law against usury] may not be waived by any oral or written agreement executed by any person."

65    Here, the reviewing court found that Delaware had a materially greater interest because it had more contacts with the loan agreements (finding that the negotiation, performance, and execution of the loan took place in Delaware). However, in *Kaneff*, although the Pennsylvania resident drove to Delaware and signed the loan agreement in Delaware, the lender was a Delaware corporation, the loan required repayment in Delaware, and the loan agreement had a Delaware choice-of-law provision, the court held that "Pennsylvania has a materially greater interest than Delaware in the determination of whether the arbitration clause is unconscionable." *Kaneff v. Delaware Title Loans*, F.3d 616, 623-24 (3rd Cir. Nov. 24, 2009). In *Gregoria*, the Pennsylvania borrowers also travelled to Delaware to sign an auto title loan provided by a Delaware company and the agreement had a Delaware choice-of-law provision. The court, citing *Kaneff*, applied Pennsylvania law finding that Pennsylvania's "antipathy to high interest rates" was a fundamental policy. *Gregoria v. Total Asset Recovery, Inc.*, 2015 WL 115501, at *4 (E.D. Pa. Jan. 8, 2015).

66    The reviewing court did not provide an analysis as to why it did not vacate the Baird arbitration award. However, the reviewing court's Opinion stated that *Kaneff* and *Gregoria* were inapplicable to Griffin and Medora, in part, because they withdrew their unconscionability claims; it did not state the same concerning Mr. Baird, who had not withdrawn his unconscionability claim.

67    Because Appellants failed to provide evidence that the arbitrator willfully flouted the law concerning the Baird arbitration award, summary judgment in favor of the Borrowers on this issue was properly granted.

---

End of Document                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:19-cv-01590-SHR   Document 41-4   Filed 09/09/20   Page 13 of 38

Backpage.com, LLC v. Hawley, Not Reported in Fed. Supp. (2017)

2017 WL 5726868

2017 WL 5726868
Only the Westlaw citation is currently available.
United States District Court,
E.D. Missouri, Eastern Division.

BACKPAGE.COM, LLC, Plaintiff,

v.

Joshua D. HAWLEY, Defendant.

Case No. 4:17–CV–1951 PLC
|
Signed 11/28/2017

**Attorneys and Law Firms**

James Condon Grant, Pro Hac Vice, Davis and Wright LLP, Seattle, WA, Mark Sableman, Michael L. Nepple, Thompson Coburn, LLP, St. Louis, MO, Robert Corn-Revere, Pro Hac Vice, Robert Edward Miller, Pro Hac Vice, Ronald Gary London, Pro Hac Vice, Davis and Wright LLP, Washington, DC, for Plaintiff.

Dean John Sauer, Michael Charles Martinich–Sauter, Joshua M. Divine, Attorney General of Missouri, Jefferson City, MO, for Defendant.

**MEMORANDUM AND ORDER**

PATRICIA L. COHEN, UNITED STATES MAGISTRATE JUDGE

**\*1** This matter is before the Court on Defendant Missouri Attorney General Joshua Hawley's motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [1] (ECF No. 21No. 21). Plaintiff Backpage.com opposes the motion. (ECF No. 34No. 34). The Court held a hearing on AG Hawley's motion to dismiss. For the reasons that follow, the Court grants AG Hawley's motion to dismiss. [2]

### I. Factual and Procedural Background

In May 2017, AG Hawley issued civil investigative demands (CIDs) to Backpage, Backpage's CEO Carl Ferrer, and two other corporate officers (collectively, "Backpage Recipients") for the purpose of investigating possible violations of the Missouri Merchandising Practices Act (MMPA), Mo. Rev. Stat. §§ 407.010, et seq. (ECF Nos. 1 at 12, 21–2). The

MMPA broadly prohibits false, fraudulent, or deceptive merchandising practices and "imposes criminal penalties and civil liability on persons who engage in conduct that it deems unlawful." Huch v. Charter Commc'ns Inc., 290 S.W.3d 721, 725 (Mo. banc 2009).

Each CID advised: "The investigation will inquire into the activities of [Backpage Recipients] in connection with the sale or advertisement, as defined in Section 407.010, RSMo, of commercial sexual conduct, other sexually oriented services, massage services, dating services and other merchandise" to "determine whether the [Backpage Recipients] have used deception, fraud, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of material fact in connection with the sale or advertisement of the above merchandise." (ECF No. 21–2 at 1No. 21–2 at 1).

The CID served upon Backpage demanded Backpage provide AG Hawley the information and documents described in twenty-four numbered paragraphs by June 7, 2017. (Id. at 3). Among other things, the CID demanded Backpage:

- Provide all documents concerning Backpage's reviewing, blocking, deleting, editing, or modifying advertisements that appear on its website, either by Backpage employees or agents, or by automated software processes, including but not limited to policies, manuals, memoranda, and guidelines.

- Provide all documents concerning advertising posting limitations, including but not limited to the "Banned Terms List," the "Grey List," and error messages, prompts, or other messages conveyed to users during the advertisement drafting or creation process.

**\*2** • Provide all documents concerning human trafficking, sex trafficking, human smuggling, prostitution, or the facilitation or investigation thereof, including but not limited to policies, manuals, staff training materials, memoranda, and guidelines.

- Identify every posting or advertisement posted in the Adult Section of the Missouri Locations that was either (a) deleted, edited, or modified by Backpage employees or agents, or (b) blocked, deleted, edited, or modified by any automated software process.

- For each posting or advertisement identified in response [to the preceding paragraph], provide both (a) a copy of the posting or advertisement as originally submitted

Case 1:19-cv-01590-SHR   Document 41-4   Filed 09/09/20   Page 14 of 38

Backpage.com, LLC v. Hawley, Not Reported in Fed. Supp. (2017)

2017 WL 5726868

by the Backage user, and (b) a copy of the posting or advertisement as it was publicly posted on Backpage.

(Id. at ¶¶ 4, 5, 7, 11, 12). The CID advised Backpage that "an extension of time or modification of the terms of the Investigative Demand may be sought only for good cause pursuant to the terms of Section 407.070, RSMo." (Id. at 6). In addition, the CID warned that Section 407.080 "makes certain acts done with the intent to avoid, evade, or prevent compliance in whole or in part with any Investigative Demand served hereunder a Class A Misdemeanor[.]" (Id.).

The parties dispute whether Assistant Attorney General Mary Morris extended Backpage's deadline for responding to the CID. (ECF Nos. 21–1 at ¶ 15, 45 at ¶ 4–5). While the parties agree that attorney Jim Grant called Ms. Morris and requested an extension of time, they dispute whether he identified himself as counsel for Mr. Ferrer alone or for Mr. Ferrer and Backpage. Id. According to Ms. Morris, Mr. Grant identified himself as counsel for Mr. Ferrer, and she agreed to extend the deadline for Mr. Ferrer's response from June 7, 2017 until July 7, 2017. (ECF No. 21–1 at ¶¶ 16–19No. 21–1 at ¶¶ 16–19). Mr. Grant avers that he informed Ms. Morris that he represented Backpage and Mr. Ferrer, as evidenced by his subsequent email to Ms. Morris thanking the AG's office for granting "my clients" an extension. [3] (ECF Nos. 14–11, 45).

On June 15, 2017, AG Hawley filed in the Circuit Court of St. Charles County a "Petition for Order to Enforce Civil Investigative Demand" against Backpage pursuant to Mo. Rev. Stat. § 407.090. [4] (ECF Nos. 1 at ¶ 43, 21–5). In the petition, AG Hawley stated that he initiated the investigation into possible violations of the MMPA and issued the CID based upon a report by the United States Senate's Permanent Subcommittee on Investigations, which revealed Backpage's role in facilitating and concealing illegal activity, such as human trafficking and commercial sexual exploitation. (ECF No. 21–5 at ¶ 1No. 21–5 at ¶ 1). AG Hawley alleged that Backpage had neither "produced any requested documentation or information, nor...filed a petition to extend the return date for, or to modify or set aside the [CID]" pursuant to Mo. Rev. Stat. § 407.070, and therefore requested an order enforcing the CID. (Id. at ¶¶ 18, 22, 23).

*3 On July 11, 2017, Backpage filed in this Court a "complaint for injunctive and declaratory relief," asking the Court to "enjoin and declare unlawful" AG Hawley's efforts to investigate and prosecute it under the MMPA. (ECF No. 1). In the complaint, Backpage argues that Section 230 of the

Communications Decency Act (CDA), 47 U.S.C. § 230, bars state law claims against internet websites and publishers arising from content created by a third party. (Id. at 17–18). Backpage also claims that AG Hawley's investigation and the CID violated: the rights of Backpage and its users under the First and Fourteenth Amendments; Backpage's rights under the Fourth, Fifth, and Fourteenth Amendments; and the MMPA. (Id. at 18–21). Approximately two weeks later, Backpage filed a motion for preliminary injunction based on its purported immunity under the CDA and its constitutional rights under the First, Fourth, and Fifth Amendments. (ECF No. 11No. 11).

AG Hawley moved to dismiss Backpage's complaint pursuant to Rules 12(b)(1) and 12(b)(6). (ECF No. 21No. 21). In his motion, AG Hawley argues that the Court should dismiss the case pursuant to Younger v. Harris, 401 U.S. 37 (1971) and that Backpage failed to state a claim upon which relief can be granted. (ECF No. 21 at 10–11No. 21 at 10–11). Backpage responded (ECF No. 34No. 34), and the Court heard arguments regarding the application of the Younger doctrine. Backpage has since filed a "Second Motion for Preliminary Injunction to Prevent Enforcement of 15 CSR 60–16.040" (ECF No. 48No. 48). In that motion, Backpage contends that the state regulation, entitled "Conducting Sex Trafficking Under False Pretenses" and effective October 30, 2017, directly conflicts with the Section 230 of the CDA and unconstitutionally restricts free speech. (Id.).

### II. Legal Standard

Federal courts have a "virtually unflagging obligation...to exercise the jurisdiction given them." Barzilay v. Barzilay, 536 F.3d 844, 849 (8th Cir. 2008) (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)). However, the United States Supreme Court has articulated several abstention doctrines as exceptions to the rule, including the Younger doctrine. Id. Under Younger, the district court has discretion to decline jurisdiction when federal action would needlessly interfere with an ongoing state proceeding. Geier v. Missouri Ethics Comm'n, 715 F.3d 674, 678 (8th Cir. 2013).

### III. Discussion [5]

*4 AG Hawley argues that the Younger doctrine bars this Court's consideration of Backpage's complaint because the state-court action: (1) is ongoing; (2) implicates

Case 1:19-cv-01590-SHR  Document 41-4  Filed 09/09/20  Page 15 of 38

Backpage.com, LLC v. Hawley, Not Reported in Fed. Supp. (2017)

2017 WL 5726868

important state interests, namely, enforcement of Missouri's consumer-protection laws; and (3) provides Backpage ample opportunity to raise its federal-law arguments in opposition to enforcement of the CID. (ECF No. 21 at 11–13 No. 21 at 11–13). In response, Backpage contends that AG Hawley based his motion to dismiss on "outdated authority" and that "this case presents no basis for abstention under the limited exceptions of Younger and Sprint Communications v. Jacobs, [134 S.Ct. 584 (2013) ("Sprint") ]." (ECF No. 34 at 26 No. 34 at 26).

The Younger abstention doctrine provides that, in "exceptional circumstances," a federal court must "refus[e] to decide a case in deference to the States." Sprint, 134 S.Ct. at 591 (quoting New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350, 368 (1989) ("NOPSI")). This doctrine originates from the underlying principles of: equity, which provides that "courts of equity should not act...when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief"; and " 'comity,' that is, a proper respect for state functions." Younger, 401 U.S. at 43–44. See also Ohio Bureau of Emp't Servs. v. Hodory, 431 U.S. 471, 479 (1977) (Younger abstention "allow[s] the State an opportunity to 'set its own house in order' when the federal issue is already before a state tribunal.").

While the Younger doctrine originally applied only to state criminal proceedings, the Supreme Court has enlarged the doctrine to include certain civil actions. See, e.g., Juidice v. Vail, 430 U.S. 327 (1977); Huffman v. Pursue, Ltd., 420 U.S. 592 (1975). Nevertheless, as the Supreme Court recently clarified, Younger does not apply to "all parallel state and federal proceedings." Sprint, 134 S. Ct. at 593. In Sprint, the Court reaffirmed its holding in NOPSI that Younger abstention only limits federal-court intervention in the following three categories of state proceedings: (1) ongoing state criminal prosecutions; (2) "certain 'civil enforcement proceedings' "; and (3) "pending civil proceedings involving certain orders...uniquely in furtherance of the state courts' ability to perform their judicial functions." Id. at 591 (citing NOPSI, 491 U.S. at 368).

The Sprint Court employed a three-step approach to Younger abstention. First, a court determines whether a particular state proceeding falls within one of the Sprint categories. Sprint, 134 S. Ct. at 591. If so, a court must consider whether the three factors articulated in Middlesex Cty. Ethics Comm'n v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982) support abstention. Id. at 593. In Middlesex, the Supreme Court identified three factors a court must consider before invoking Younger: (1) the existence of an "an ongoing state judicial proceeding," which (2) "implicate[s] important state interests," and (3) provides "an adequate opportunity to raise the constitutional claims." Middlesex, 457 U.S. at 432. See also Sprint, 134 S. Ct. at 593 (the Middlesex factors are "not dispositive; they [are] instead, additional factors appropriately considered by the federal court[.]").

If the case satisfies the requirements of Sprint and Middlesex, a court considers whether any of the exceptions to the Younger doctrine apply. Middlesex, 457 U.S. at 435. The Supreme Court has held that, even where all of the above factors are satisfied, a court should decline to invoke Younger if there is a "showing of bad faith, harassment, or some other extraordinary circumstance that would make abstention inappropriate." Id.

*A. Sprint categories*

**\*5** Backpage argues that Younger abstention is improper because the state-court action does not fit any of the state proceeding categories set forth in Sprint. (ECF No. 34 at 28–29 No. 34 at 28–29). More specifically, Backpage contends that the state-court action: (1) is not a criminal proceeding; [6] (2) is not a "civil enforcement proceeding" because the State has not brought any civil claims or criminal charges against Backpage; and (3) does not concern an order "uniquely in furtherance of the state court['s] ability to perform [its] judicial functions." Id. at 28–29 (quoting Sprint, 134 S. Ct. at 591). In his reply brief, AG Hawley asserts that the state-court action falls into both the second and third Sprint categories because it: (1) is a civil enforcement proceeding; and (2) involves a state court's ability to perform its judicial functions.

1. Civil Enforcement Proceeding

Case 1:19-cv-01590-SHR Document 41-4 Filed 09/09/20 Page 16 of 38

Backpage.com, LLC v. Hawley, Not Reported in Fed. Supp. (2017)

2017 WL 5726868

Younger abstention applies where a state-court, civil enforcement proceeding is "akin to a criminal prosecution" in "important respects." Sprint, 134 S.Ct. at 592 (quoting Huffman, 420 U.S. at 604). The Sprint Court identified several indicia of civil enforcement proceedings. Id. First, "[s]uch enforcement actions are characteristically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act." Id. (citing Middlesex, 457 U.S. at 433–34). Additionally, "[i]n cases of this genre, a state actor is routinely a party to the state proceeding and often initiates the [state] action" and "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges." Id.

Assessing the nature of the state-court action requires an understanding of the CIDs issued pursuant to the MMPA. As previously stated, the MMPA prohibits false, fraudulent, or deceptive merchandising practices and "imposes criminal penalties and civil liability on persons [7] who engage in conduct that it deems unlawful." Huch, 290 S.W.3d at 725 (footnote added). See also Mo. Rev. Stat. §§ 407.020.4, 407.100, 407.130. "One of the responsibilities of the AG is investigating and prosecuting violations of Missouri's consumer protection statutes[.]" State ex rel Koster v Charter Commc'ns Inc., 461 S.W.3d 851, 853 (Mo.App.W.D. 2015). In furtherance of these investigations, the MMPA authorizes the Attorney General to issue a CID when it "appears...that a person has engaged in or is engaging in any method, act, use, practice or solicitation declared to be unlawful by this chapter[.]" Mo. Rev. Stat. § 407.040.1. A CID is an administrative subpoena, Charter Commc'ns, 461 S.W.3d at 857, that requires the recipient "to appear and testify, or to produce relevant documentary material or physical evidence [f]or examination[.]" Mo. Rev. Stat. § 407.040.1.

The recipient of a CID may, "[a]t any time before the return date specified in a [CID]..., or within twenty days after the [CID] has been served," file in circuit court "a petition to extend the return date for, or to modify or set aside the civil investigative demand, stating good cause[.]" Mo. Rev. Stat. § 407.070. The MMPA further provides that:

> Any person who, with intent to avoid, evade, or prevent compliance, in whole or in part, with any [CID], removes from any place, conceals,

> withholds, or destroys, mutilates, alters, or by any other means falsifies any information, documentary material, or physical evidence[,]… which is the subject of any such [CID] shall be guilty of a class A misdemeanor.

Mo. Rev. Stat. § 407.080.

**\*6** CIDs are not self-enforcing. Charter Commc'ns, 461 S.W.3d at 857. This means that the issuing agency cannot itself sanction non-compliance. Id. Importantly, however, "[i]f the recipient refuses to comply with the CID, the AG may seek to have the court order compliance pursuant to section 407.090." Id. See also Mo. Rev. Stat. § 407.090 (if the recipient fails to comply with the CID, the attorney general "may file, in the trial court of general jurisdiction...a petition for an order of such court for the enforcement of such civil investigative demand[.]").

Here, AG Hawley is a state actor who initiated the state-court action for the purpose of obtaining "an Order enforcing the Investigative Demand, and ordering Backpage to produce responses to [the CID.]" (ECF No. 21–5No. 21–5). The state-court action clearly involves an investigation with the potential to culminate in the filing of a formal complaint or charges. As such, the state-court action satisfies the indicia of the second Sprint category.

Backpage contends that the state-court action is not "a civil enforcement proceeding" for purposes of Younger abstention because AG Hawley is only investigating, not prosecuting, possible MMPA violations. (ECF No. 34 at 28–31No. 34 at 28–31). In support of its argument, AG Hawley cites Cedar Rapids Cellular Tel., L.P. v. Miller, 280 F.3d 874 (8th Cir. 2002). [8] In Cedar Rapids Cellular, the attorney general brought a civil enforcement action against U.S. Cellular, the parent corporation of Cedar Rapids Cellular and Davenport Cellular, alleging violations of the Iowa Consumer Credit Code. Id. at 876. On the same day, Cedar Rapids Cellular, Davenport Cellular, and a third cellular company, WWC License, filed a complaint in federal district court seeking to "enjoin the Attorney General from taking any action...to enforce" the Iowa Consumer Credit Code against them. Id.

Case 1:19-cv-01590-SHR   Document 41-4   Filed 09/09/20   Page 17 of 38

Backpage.com, LLC v. Hawley, Not Reported in Fed. Supp. (2017)

2017 WL 5726868

at 877. Citing several abstention doctrines, the district court abstained. Id. at 878.

The Eighth Circuit affirmed the district court's decision to invoke Younger and abstain from the claims of the two federal plaintiffs in which U.S. Cellular, the state-court defendant, had "a controlling interest." Id. at 882. However, the court found "that Younger does not provide a basis for abstaining from the claims of WWC" because WWC was neither directly involved in the state-court proceeding nor closely related to U.S. Cellular. Id.

In reversing the district court's decision to abstain from deciding WWC's claims, the Eighth Circuit rejected the attorney general's argument that "his attempt to obtain information from WWC triggered Younger abstention." Id. The Eighth Circuit reasoned that, while administrative proceedings may be judicial for purposes of Younger if they "declare and enforce liabilities between the parties," the attorney general's administrative action against WWC "involve[d] nothing more than an attempt to obtain information about WWC's business practices." Id. The court stated: "Although the Attorney General's demand for information may ultimately result in a judicial proceeding, there is no indication that a judicial proceeding was imminent at the time this case was filed." Id. See also Google, Inc. v. Hood, 822 F.3d 212 (5th Cir. 2016) (district court properly declined to abstain because there was no "ongoing judicial proceeding" where the attorney general had issued an administrative subpoena but had "not moved to enforce [it] in any state court[.]").

*7 Unlike WWC, the federal plaintiff not involved in the state-court action in Cedar Rapids Cellular, Backpage is the defendant in the state-court action. Because Backpage is the defendant in the pending state-court action, Backpage more closely resembles the two federal plaintiffs to which the Eighth Circuit held that Younger applied. Moreover, whereas no judicial proceeding against WWC was "imminent," AG Hawley served the CID and filed the state-court action to enforce it, thereby triggering judicial oversight of the CID. Based on the above, the Court finds that the state-court action is "a civil enforcement proceeding" as required for application of the Younger abstention doctrine.

2. Uniquely in Furtherance of State Courts' Functions

The third category of state-court proceeding justifying Younger abstention encompasses "civil proceedings involving certain orders...uniquely in furtherance of the state courts' ability to perform their judicial functions." Sprint, 134 S.Ct. at 591. Backpage argues that this case does not satisfy the third Sprint category because Backpage does not challenge a prior judgment or state-court procedure. (ECF No. 34 at 29No. 34 at 29). AG Hawley counters that this case falls within the third Sprint category because it implicates a state court's ability to enforce subpoenas under state law. (ECF No. 42 at 7–9).

In establishing the third Sprint category, the Supreme Court cited two cases: Juidice v. Vail and Pennzoil Co. v. Texaco, Inc., 481 U.S. 1 (1987). In Juidice, the Supreme Court held that Younger abstention was proper where, after a state court held the federal plaintiff in contempt of court for failing to comply with a subpoena, the plaintiff filed a federal action seeking to enjoin the state court's use of statutory contempt procedures. Juidice, 430 U.S. at 330. The Court held that principles of comity and federalism required abstention because "[t]he contempt power lies at the core of the administration of a State's judicial system" and "such interference with the contempt process...'unduly interfere(s) with the legitimate activities of the Stat(e).' " Id. at 335, 336 (quoting Younger, 401 U.S. at 44). The Pennzoil Court followed Juidice, holding that Younger abstention was proper where the exercise of federal jurisdiction would interfere with a state court's proceeding concerning the requirement of the posting of bond pending appeal. Pennzoil, 481 U.S. at 12–13 ("States have important interests in administering certain aspects of their judicial systems.").

While Juidice and Pennzoil "involve[d] challenges to the processes by which the State compels compliance with the judgments of its courts," nothing in either case established that a prior judgment is a requisite for abstaining pursuant to the third Sprint category of state-court proceedings. The "salient fact" in those cases was that federal-court interference with the State's process is "an offense to the State's interest" and "can readily be interpreted 'as reflecting negatively upon the state courts' ability to enforce constitutional principles.' " Juidice, 430 U.S. at 336 (quoting Huffman, 420 U.S. at 604).

Case 1:19-cv-01590-SHR   Document 41-4   Filed 09/09/20   Page 18 of 38

Backpage.com, LLC v. Hawley, Not Reported in Fed. Supp. (2017)

2017 WL 5726868

Here, Backpage requests this Court enjoin and declare unlawful AG Hawley's efforts to investigate and prosecute Backpage under the MMPA. Pursuant to the MMPA, state courts play a significant role in the investigation and prosecution of unlawful merchandising practices. As previously discussed, the MMPA authorizes the attorney general to issue CIDs to investigate suspected unlawful merchandising practices, and "[a] person upon whom a [CID] is served...shall comply with the terms thereof unless otherwise provided by an order of a court." Mo. Rev. Stat. §§ 407.040, 407.080. If the recipient of a CID fails to comply with its demands, the attorney general may file in state court a petition "for an order of such court for the enforcement" of the CID," and "[a]ny disobedience of any final order entered under this section by any court shall be punished as a contempt thereof." Mo. Rev. Stat. § 407.090.

**\*8** AG Hawley filed the state-court action to enforce the CID pursuant to Section 407.090. As a result, Backpage's request that the Court enjoin AG Hawley's efforts to investigate and prosecute potential violations of the MMPA necessarily affects functions performed by the state court. The Court therefore holds that the state-court action is a "civil proceeding[ ] involving certain orders...uniquely in furtherance of the state courts' ability to perform their judicial functions." See e.g., Lupin Pharm., Inc. v. Richards, No. RDB–15–1281, 2015 WL 4068818, at *3–4 (D. Md. July 2, 2015) (federal plaintiff's action to enjoin enforcement of CIDs, issued by the state's attorney general investigating potential violations of antitrust and consumer-protection statutes, implicated the state's interest in enforcing the orders and judgments of its courts). Accordingly, the third Sprint category also requires this Court to abstain pursuant to Younger.

### B. Middlesex "additional factors"

Having determined that the state-court action satisfies at least one of the Sprint categories, the Court must consider the three "additional factors" that the Supreme Court articulated in Middlesex, 457 U.S. at 432. See also Sprint, 134 S. Ct. at 593. Before invoking Younger, a federal court must consider whether: (1) there is an ongoing state proceeding that is judicial in nature, (2) which implicates important state interests, and (3) provides an adequate opportunity to raise federal challenges. Sprint, 134 S. Ct. at 593.

The parties do not dispute that the state-court action is ongoing and judicial in nature. Backpage argues, however, that the state-court action "should not constitute a pending state-court action for abstention purposes" because AG Hawley filed the petition in advance of the agreed-upon deadline for responding to the CIDs "to obstruct federal jurisdiction." (ECF No. 34 at 31–32 No. 34 at 31–32). Backpage cites no case law for the proposition that either a race to the courthouse or allegedly disingenuous legal maneuvering defeats Younger abstention. Moreover, the Eighth Circuit has held: "There is no fixed requirement in the law that a state judicial proceeding must have been initiated before the federal case was filed for abstention to be appropriate, and a court should examine what was actually taking place in both settings to decide whether to abstain." Aaron v. Target Corp., 357 F.3d 768, 775 (8th Cir. 2004). See also Doran v. Salem Inn, Inc., 422 U.S. 922, 929 (1975) (even though the federal action was filed before the state action, Younger abstention was appropriate because litigation of the federal action was "in an embryonic stage and no contested matter had been decided.").

As AG Hawley correctly asserts in his reply brief, Younger abstention would be at issue even if AG Hawley had filed the state-court action after the extended deadline expired or Backpage responded to the CID. [9] The key factor in determining whether Younger abstention is proper is not the relative timing of the state and federal actions but "[w]hether proceedings of substance have taken place in either court." Aaron, 357 F.3d at 775. See also Ewell v. Toney, 853 F.3d 911, 916–17 (7th Cir. 2017). As both this action and the state-court action are in their preliminary stages with no contested matters having been decided by either court, considerations of equity and comity support abstention. The Court therefore finds that the state-court action satisfies the "ongoing state proceeding" factor set forth in Middlesex.

As to the second Middlesex factor, the Eighth Circuit has recognized that a state "has an important interest in enforcing its consumer protection statutes" and "protecting the public from deceptive business practices." Cedar Rapids Cellular, 280 F.3d at 879–80. Because the state-court action here involves the state's efforts to enforce the state's consumer-protection laws, it satisfies the "important state interests" requirement.

**\*9** The third Middlesex factor considers whether the federal plaintiff had, or will have, "an opportunity to present [its]

Case 1:19-cv-01590-SHR Document 41-4 Filed 09/09/20 Page 19 of 38

Backpage.com, LLC v. Hawley, Not Reported in Fed. Supp. (2017)

2017 WL 5726868

federal claims in the state proceedings." Juidice, 430 U.S. at 337. A plaintiff's "failure to avail [itself] of such opportunities does not mean that the state procedures were inadequate." Id. Additionally, the plaintiff in the federal lawsuit "carries the burden of demonstrating that the Missouri proceedings do not provide 'an adequate opportunity' for it to raise constitutional claims." Geier, 715 F.3d at 678–79. Backpage does not argue that the state-court proceedings will not provide it an adequate opportunity to raise federal preemption or constitutional challenges.

In this case, there are (or were) adequate opportunities for Backpage to present its federal claims in the state-court action. As explained above, the MMPA provides a mechanism for the recipient of a CID to challenge the CID. Mo. Rev. Stat. § 407.070 ("At any time before the return date specified in the [CID], or within twenty days after the [CID] has been served, whichever period is shorter, a petition...to modify or set aside the [CID], stating good cause, may be filed in the circuit court[.]"). At such a proceeding, the recipient of the CID may raise federal challenges. See e.g., State ex rel. Ashcroft v. Goldberg, 608 S.W.2d 385, 388 (Mo. banc 1980) (considering whether the MMPA violated a CID recipient's rights under the Fourth, Fifth, and Fourteenth Amendments); see also Charter Commc'ns, 461 S.W.3d at 858 n.5 (the defendant in the state court action did not object to the CID pursuant to section 407.070, but the trial court allowed it to assert federal defenses out of time in its answer to the attorney general's section 407.090 civil enforcement petition).

Backpage provides no authority holding that Missouri state courts lack authority to consider federal preemption and constitutional challenges. "[W]hen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." Pennzoil Co., 481 U.S. at 15. Because Backpage could have raised its federal preemption and constitutional arguments in state court, the third Middlesex factor has been satisfied. Based on the above, the Court finds that abstention is proper under either the second or third state-court proceeding categories discussed in Sprint, as well as the three factors set forth in Middlesex.

*C. Exceptions to Younger*

Backpage argues that, even if the state-court action satisfies the criteria for Younger abstention, abstention is improper because: (1) the CDA preempts the state-court action; and (2) AG Hawley acted in bad faith. (ECF No. 34 at 32–38No. 34 at 32–38). AG Hawley counters that: (1) the CDA does not immunize Backpage from liability under the MMPA; and (2) Backpage failed to demonstrate AG Hawley's bad faith.

### 1. Federal Preemption

Backpage asserts that Younger abstention is improper because the CDA shields it from "investigation and any possible claims arising from third-party postings on the website." (ECF No. 34 at 16No. 34 at 16). According to Backpage, the CDA "facially" and "conclusively" preempts AG Hawley's state-court action because AG Hawley's allegations suggest only that Backpage engaged in "*content editing*," not *content creation*." (Id. at 24) (emphasis in original). In reply, AG Hawley contends that the CDA does not preempt his efforts to enforce the MMPA against Backpage because: (1) substantial evidence indicates that Backpage actively participated in "the creation or development of information" displayed on the website; and (2) Backpage implemented extensive measures to conceal the illegality of advertisements for commercial sex. (ECF No. 42 at 12–16).

**\*10** The Supreme Court has held that "the mere assertion of a substantial constitutional challenge to state action will not alone compel the exercise of federal jurisdiction." NOPSI, 491 U.S. at 365. However, the Court left open the possibility that Younger might not require abstention where a claim of federal preemption is "facially conclusive." [10] Id. at 367. See also Cedar Rapids Cellular, 280 F.3d at 880. A federal preemption claim is not facially conclusive if its determination "requires further factual inquiry[.]" [11] Id.

Section 230 of the CDA immunizes providers of "interactive computer services" [12] against liability arising from content created by third parties. 47 U.S.C. § 230(c). "This grant of immunity applies only if the interactive computer service provider is not also an 'information content provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content." Fair Hous. Council of San Fernando Valley v.

Case 1:19-cv-01590-SHR   Document 41-4   Filed 09/09/20   Page 20 of 38

Backpage.com, LLC v. Hawley, Not Reported in Fed. Supp. (2017)

2017 WL 5726868

Roommates.com, LLC, 521 F.3d 1157, 1162 (9th Cir. 2008) (quoting 47 U.S.C. § 230(f)(3)). In effect, Section 230 "shields website operators from being 'treated as the publisher or speaker' of material posted by users of the site, which means that 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred.' " Jane Doe No. 1 v. Backpage, LLC, 817 F.3d 12, 18 (1st Cir. 2016) (internal citations and quotation omitted).

**\*11** Backpage cites Doe No. 1 for the proposition that, as an interactive computer service provider, its "choices about what content can appear on the website and in what form, are editorial choices that fall within the purview of traditional publisher functions," and are therefore shielded by the CDA. Id. at 21. In Doe No. 1, the plaintiffs, minor victims of sex trafficking, alleged that Backpage "tailored its posting requirements to make sex trafficking easier" and implemented "rules and processes governing the content of advertisements...designed to encourage sex trafficking." Id. at 16. The First Circuit held that the CDA immunized Backpage from liability under the state's anti-sex-trafficking law because: "[C]laims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230(c)(1)." Id. at 22. See also M.A. v. Village Voice Media Holdings, LLC, 809 F.Supp.2d 1041, 1048 (E.D.Mo. 2011) (Backpage was immune from liability for crimes against minor because "there is no allegation that Backpage was responsible for the development of any portion of the *content* of [the] posted ads or specifically encouraged the development of the offensive nature of that content.") (emphasis original).

Doe No. 1 is distinguishable because the plaintiffs' claims focused on Backpage's posting standards. In the state-court action here, AG Hawley alleges that Backpage's activities exceeded that of a mere publisher of third-party content. (ECF No. 21 at 17No. 21 at 17). For example, AG Hawley claims that Backpage "solicited the posting of illegal advertisements on its website" and "its own employees actively participated in the creation of those advertisements." (ECF No. 21 at 17No. 21 at 17). See, e.g., Roommates.com, 521 F.3d at 1166–67 (CDA did not apply where interactive computer service provider was responsible, at least in part, for development of subscribers' profiles displaying

discriminatory preferences). Additionally, AG Hawley states that Backpage "implemented a sophisticated system by which it identified posts likely involving illegal commercial sex, revised the content of those identified posts to limit law-enforcement attention, and then posted them to Backpage's website." (ECF No. 21 at 18No. 21 at 18). See, e.g., Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 670 (7th Cir. 2008) (Section 230 permits liability for internet service providers that "induce" advertisers to post illegal advertisements or intentionally design their systems to facilitate illegal acts).

Determining whether the CDA preempts AG Hawley's state-law MMPA claims would require the Court to: (1) consider disputed facts relating to Backpage's role in revising and posting advertisements and (2) analyze whether those activities constitute "creation or development" under the CDA. Because this issue requires further factual inquiry and detailed legal analysis, Backpage's preemption argument is not "facially conclusive," and does not defeat Younger abstention.

### 2. Bad Faith

Backpage maintains that abstention is improper because AG Hawley acted in bad faith. (ECF No. 34 at 33–38No. 34 at 33–38). Specifically, Backpage alleges that AG Hawley: (1) granted it an extension of time to respond to the CID and then filed the state-court action before that time expired; and (2) issued the CID despite his knowledge that the CDA shielded Backpage from liability for violations of state law. Id. AG Hawley counters that the bad-faith exception to Younger does not apply in this case "because the State has an appropriate basis for believing that the CDA does not bar all potential claims against Backpage." (ECF No. 21 at 13No. 21 at 13). In addition, AG Hawley denies Backpage's claim that his office granted Backpage an extension of time to respond to or comply with the CID and asserts that Backpage "mischaracterizes" previous statements made by AG Hawley and his predecessor, Attorney General Chris Koster. (ECF No. 42 at 9–11).

**\*12** "While the Supreme Court has not ruled out use of the bad faith exception in civil cases, it has never directly applied the exception in such a case and we have only recognized it in the criminal context." Tony Alamo Christian Ministries v. Selig, 664 F.3d 1245, 1254 (8th Cir. 2012) (quoting

Case 1:19-cv-01590-SHR Document 41-4 Filed 09/09/20 Page 21 of 38

**Backpage.com, LLC v. Hawley, Not Reported in Fed. Supp. (2017)**

2017 WL 5726868

Aaron, 357 F.3d at 778). Under this exception, federal courts should not abstain under Younger if "bad faith, harassment, or some extraordinary circumstance...would make abstention inappropriate." Aaron, 357 F.3d at 778 (quotation omitted). "[I]ntervention by federal courts in ongoing state proceedings requires that the 'circumstances must be "extraordinary" in the sense of creating an extraordinary pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation.' " Id. at 779 (quoting Moore v. Sims, 442 U.S. 415, 433 (1979)).

Even assuming the bad faith exception is available in the civil context, AG Hawley's alleged agreement to extend Backpage's deadline for responding to the CID and subsequent filing of the state-court action prior to that deadline does not constitute bad faith or harassment for purposes of the bad-faith exception to Younger abstention. See Aaron, 357 F.3d at 779 n.7 (evidence that the defendant failed to respond to the plaintiff's counterproposal, misrepresented the status of negotiations, and failed to provide plaintiffs notice of a public hearing did not demonstrate bad faith). Nor do AG Hawley's public statements regarding his intention to "shut down" Backpage render Younger abstention improper. See, e.g., Postscript Enters., Inc. v. Peach, 878 F.2d 1114, 1116 (8th Cir. 1989) (owner of adult bookstore did not establish bad faith even though the prosecuting attorney publicly declared he would "run [the plaintiff] out of business.").

To the extent that Backpage claims that AG Hawley necessarily acted in bad faith because he knew the CDA preempted the state-court action, the Court has found that Backpage's preemption argument is not "facially conclusive." Moreover, AG Hawley asserts that the State "has a strong evidentiary basis for concluding that the CDA does not apply to Backpage's conduct." (ECF No. 21 at 15No. 21 at 15). According to AG Hawley, the CDA does not protect Backpage from liability under the MMPA because Backpage does not simply publish unlawful content but creates and develops it. (Id).

In support of its position that AG Hawley acted in bad faith, Backpage alleges that "[AG Hawley] and his office have *admitted* Section 230 bars state prosecution of Backpage." (ECF No. 34 at 35No. 34 at 35) (emphasis in original). Backpage points to a letter to Congress from multiple states' attorneys general that AG Hawley signed on August 16, 2017. Contrary to Backpage's argument, however,

the statements in that letter do not constitute an admission that the CDA bars any state action, especially when considered in light of AG Hawley's separate letter to Congress of the same date. [13] (ECF Nos. 35–1, 42–1). In that letter, AG Hawley wrote:

> Today, I have joined 49 other Attorneys General in sending you a letter urging Congress to amend the [CDA] to clarify that the CDA does not preempt valid state and territorial criminal laws directed at suppressing the scourge of human trafficking on the Internet....I write separately to emphasize that nothing in our letter to you or in the CDA itself purports to prevent authorities from investigating and pursuing those who engage in human trafficking on the Internet by providing *content* for internet communications related to human trafficking.

(ECF No. 42–1) (emphasis in original). Based on the record, the Court finds there was insufficient evidence of bad faith to support application of an exception to Younger abstention.

### IV. Conclusion

**\*13** For the reasons stated herein, the Court holds that abstention is proper in this case. Because the Court abstains on Younger grounds, it declines to address AG Hawley's argument that Backpage failed to state a claim upon which relief can be granted.

Accordingly, after careful consideration,

**IT IS HEREBY ORDERED** that AG Hawley's motion to dismiss (ECF No. 21No. 21) is **GRANTED**.

**IT IS FURTHER ORDERED** that Backpage's motion for preliminary injunction (ECF No. 11No. 11) and second motion for preliminary injunction (ECF No. 48No. 48) are **DENIED** as moot.

Case 1:19-cv-01590-SHR  Document 41-4  Filed 09/09/20  Page 22 of 38

Backpage.com, LLC v. Hawley, Not Reported in Fed. Supp. (2017)

2017 WL 5726868

**IT IS FINALLY ORDERED** that Backpage's motion to file an amended complaint (ECF No. 51No. 51) is **DENIED** as moot.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5726868

## Footnotes

1    Plaintiff Backpage.com, LLC and AG Hawley consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

2    Causes of action for damages may be stayed but not dismissed on abstention grounds. Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 721 (1996). In contrast, abstention under Younger v. Harris, 401 U.S. 37 (1971) applies in a case where only injunctive or equitable relief is sought, the proper disposition is dismissal of the federal action. Yamaha Motor Corp., U.S.A. v. Stroud, 179 F.3d 598, 603–04 (8th Cir. 1999). Because Backpage seeks only equitable relief and no monetary damages, dismissal is proper.

3    Mr. Grant responded to the CID on behalf of Mr. Ferrer and Backpage on July 7, 2017. (ECF Nos. 21–1 at ¶ 29; 21–7). Their response to the CID consisted entirely of objections and they produced no documents. (ECF No. 21–7No. 21–7).

4    The court takes judicial notice of the pending state-court docket of State of Missouri, ex rel. Attorney General Hawley v. Backpage.com, LLC, No. 1711–CC00589 (Circuit Court of St. Charles County, filed June 15, 2017) available at https://www.courts.mo.gov/casenet. See e.g., Matter of Phillips, 593 F.2d 356, 358 (8th Cir. 1979) (a federal court may properly take judicial notice of state-court proceedings).

5    The parties dispute whether the Court should consider the issue of Younger abstention pursuant to the pleading and burden requirements of either Rule 12(b)(1) or Rule 12(b)(6). AG Hawley argues that Younger abstention implicates Rule 12(b)(1), providing for dismissal due to a court's lack of subject matter jurisdiction, because, according to the Supreme Court, "Younger abstention is 'treated as jurisdictional.' " (ECF No. 42 at 2) (quoting Steel Co. v. Citizens for a Better Env't., 523 U.S. 83, 100 n. 3 (1998)). Backpage argues Rule 12(b)(1) is not the proper vehicle for considering Younger abstention because Rule 12(b)(1) motions challenge the existence of subject matter jurisdiction, and the issue here is not whether the Court has jurisdiction but whether the Court should exercise that jurisdiction. (ECF No. 34 at 6–7No. 34 at 6–7). See Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc., 477 U.S. 619, 626 (1986) (Younger abstention "does not arise from lack of jurisdiction in the District Court, but from strong policies counseling against the exercise of such jurisdiction where particular kinds of state proceedings have already been commenced."). According to Backpage, AG Hawley's motion to dismiss should be treated as a Rule 12(b)(6) motion and, consequently, the Court should not consider evidence outside the pleadings. (ECF No. 34 at 6–7No. 34 at 6–7). However, "Rule 12(b)(6) does not seem apt because the request for abstention is more in the nature of a defense and depends on assertions not ordinarily included in a complaint." Christian Action Network v. Maine, 679 F.Supp.2d 140, 143 n.2 (D.Me. 2010). The Court relies upon neither rule and finds that,"[b]ecause [Younger] abstention is 'a prudential rather than a jurisdictional ground for dismissal,' the pleading and burden requirements of Rule 12(b)(6) are not applicable, nor is the court 'limited to the facts that the plaintiff pleaded to determine whether comity and federalism counsel against [the] exercise of jurisdiction." Gall v. Steele, No. 2:13–CV–111 CDP, 2015 WL 75234, at *1 n.2 (E.D.Mo. Jan. 6, 2015) (quoting Christian Action Network, 679 F.Supp.2d at 143 n.2). See also Chicago Ins. Co. v. Diocese of Kansas City–St. Joseph, No. 4:13–CV–678 DGK, 2014 WL 556358, at *1 (W.D.Mo. Feb. 13, 2014).

Case 1:19-cv-01590-SHR   Document 41-4   Filed 09/09/20   Page 23 of 38

Backpage.com, LLC v. Hawley, Not Reported in Fed. Supp. (2017)

2017 WL 5726868

6    Neither party characterizes the state-court action as a criminal proceeding. Therefore, the Court need not address that <u>Sprint</u> category.

7    The MMPA defines the term "person" to include: "any natural person or his legal representative, partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign, company, foundation, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof[.]" Mo. Rev. Stat. § 407.010(5).

8    Plaintiff also cites the Ninth Circuit's decision in ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund, 754 F.3d 754 (9th Cir. 2014). <u>ReadyLink</u> is inapposite. In that case, ReadyLink initiated "parallel judicial proceedings" in state and federal court against the State Compensation Insurance Fund, "an 'insurer' on the same basis as any private carrier offering workers' compensation." Id. at 756. The Ninth Circuit held that the district court erred in abstaining under <u>Younger</u> because a state-court proceeding in which "a state judicial officer resolves a dispute between two private parties" is not akin to a criminal prosecution. Id. at 760.

9    AG Hawley asserts that, even if the State had waited until the July 7, 2017 deadline when Backpage responded to the CID, he would have filed the state-court action because Backpage's response was "plainly deficient and included no responsive documents or information." (ECF No. 21 at 23No. 21 at 23).

10    The Eighth Circuit has recognized a possible exception to <u>Younger</u> abstention for preemption claims that are "facially conclusive," but declined to rule on it. Cedar Rapids Cellular, 280 F.3d at 880. Other federal courts of appeal have held that such an exception exists. See Sirva Relocation, LLC v. Richie, 794 F.3d 185, 198 (1st Cir. 2015); Hughes v. Attorney General of Florida, 377 F.3d 1258, 1265 (11th Cir. 2004).

11    The Eighth Circuit has not addressed what makes a claim facially conclusive. See Minnesota Living Assistance, Inc. v. Peterson, No. 17–1011 (DSD/DTS), 2017 WL 2804905, at *2 (D. Minn. June 28, 2017). "Other circuits, however, have identified the following scenarios where preemption claims are not facially conclusive: (1) when a further factual inquiry is required; (2) when the claim involves a question of first impression; and (3) when the court must conduct a 'detailed analysis' of the state statute in question[.]" Id. (internal citation omitted). See also Sirva, 794 F.3d at 198–99 ("[W]hen a federal statute indisputably preempts a state-law claim, preemption is facially conclusive...But when there is reasonable doubt, the preemption claim is not facially conclusive and cannot block abstention."); Hughes, 377 F.3d at 1265 ("[O]nly the clearest of federal preemption claims would require a federal court to hear a preemption claim when there are underlying state-court proceedings and when that claim can be raised in the state forum."). "When courts have found that preemption was facially conclusive, they merely applied established precedent that easily resolved the preemption issue." Minnesota Living, 2017 WL 2804905, at *2 (citing Chaulk Servs., Inc. v. Mass. Comm'n Against Discrimination, 70 F.3d 1361, 1370 (1st Cir. 1995); Gartrell Constr. Inc. v. Aubry, 940 F.2d 437, 441–442 (9th Cir. 1991)).

12    The CDA defines the term "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server[.]" 47 U.S.C. § 230(f)(2). The parties agree that Backpage is an interactive computer service" provider.

13    Backpage also argues that a July 2013 multi-state letter signed by former Attorney General Koster evidences AG Hawley's knowledge that the CDA precludes his "tak[ing] action of the sort in question here." (ECF Nos. 34 at 35; 14–5). However, Backpage cites no authority to support its position that AG Hawley is "bound by his predecessor's admissions." (ECF No. 34 at 35No. 34 at 35).

---

**End of Document**                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Auto Equity Loans of Delaware, LLC v. Baird, Del.Com.Pl., May 2, 2018

2015 WL 115501

United States District Court,
E.D. Pennsylvania.

Constantine J. GREGORIA, et. al., Plaintiffs,

v.

TOTAL ASSET RECOVERY,
INC., et. al., Defendants.

Civil Action No. 12–4315.
|
Signed Jan. 7, 2015.
|
Filed Jan. 8, 2015.

**Attorneys and Law Firms**

Robert F. Salvin, Bala Cynwyd, PA, for Plaintiffs.

Elizabeth F. Walker, Campbell Lipski & Dochney, Philadelphia, PA, for Defendants.

**MEMORANDUM**

STENGEL, District Judge.

**\*1** Constantine J. Gregoria and Christie J. Hudson bring this action against Total Asset Recovery, Inc., and its owner and CEO Matthew Howard alleging violations of the Fair Debt Collection Practices Act,[1] 15 U.S.C. § 1692, et seq., and the Racketeer Influenced and Corrupt Organizations Act,[2] 🚩 18 U.S.C. § 1962(c). These claims arise from the repossession of the plaintiffs' car as collection for an allegedly usurious loan. The defendants filed a motion to dismiss pursuant to Rules 12(b)(6), 12(b)(7), and 19 of the Federal Rules of Civil Procedure, and the plaintiffs responded. For the following reasons, I will grant the motion in part.

**I. BACKGROUND**

The plaintiffs were the owners of a 2006 Nissan Altima with a clear title, valued at over $10,000. The vehicle was titled, registered, and licensed in Pennsylvania, and was kept at the plaintiffs' personal residence in Marcus Hook. The plaintiffs were in need of a personal loan and went to a Delaware company known as Delaware Title Loans [DTL] for an auto title loan. The complaint describes an auto title loan as a "small personal loan issued at an enormous triple digit rate of interest, secured by a borrower's car. The loans are used to exploit people with poor credit and a crushing need for cash."

Beginning in June 2011, DTL entered into a series of five loan agreements with the plaintiffs wherein it lent the plaintiffs a total of $4,039 at 150% A.P.R. The plaintiffs were able to repay $2,013 but most of that money was applied to interest. By December 2012, the monthly payment for these loans had reached $630. Because the plaintiffs were late on their payments for February and March 2012, DTL sought to repossess their vehicle.

The complaint alleges that Defendant Total Asset Recovery [TAR], under the authority of Defendant Matthew Howard, agreed to work for DTL to repossess the plaintiffs' vehicle. TAR is a Delaware corporation. The complaint further alleges that "Total Asset Recovery is in the automobile repossession business and qualified as a debt collector under the Fair Debt Collection Practices Act." Its principal business is the collection of debts through the enforcement of security interests and uses various instrumentalities of interstate commerce in the course of its business including motor vehicles (tow trucks), the internet, telephones, and the mail.

On April 25, 2012, TAR "crossed the border into Pennsylvania" and repossessed the plaintiffs' vehicle in the vicinity of their home. The complaint insists that the repossession was performed pursuant to the express authorization and direction of Mr. Howard who had decided that his business would perform repossessions within Pennsylvania to enforce usurious auto title loans from Delaware. The plaintiffs believe that the defendants agreed to this repossession either knowing that the auto title loan was illegal or without performing any due diligence to determine the validity or legality of the loan or their right to enter Pennsylvania and repossess a car to enforce a 150% annual interest rate.

**\*2** The plaintiffs had various personal effects and possessions in their vehicle which have never been returned to them. Although the car was valued at over $10,000, the plaintiffs have not received any money back from the repossession. Accordingly, in bringing this action, the plaintiffs seek in Count I an award of actual and statutory damages including damages for the deprivation of their vehicle, expenses for alternative transportation, emotional

distress, attorney's fees, and costs. In Count II, they seek an award of damages against Defendant Howard equivalent to three times their actual damages including their economic and noneconomic injuries.

## II. STANDARD

A complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). This statement must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A complaint need not contain detailed factual allegations, but a plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action" to show entitlement to relief as prescribed by Rule 8(a)(2). *Id.* at 1965; *Evancho v. Fisher,* 423 F.3d 347, 350 (3d Cir.2005). A defendant may attack a complaint by a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

In deciding a motion to dismiss under Rule 12(b)(6), I may consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben.Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). I must accept as true all of the factual allegations in the complaint, *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), and all reasonable inferences permitted by the factual allegations, *Watson v. Abington* Twp., 478 F.3d 144, 150 (3d Cir.2007), viewing them in the light most favorable to the plaintiff. *Kanter v. Barella,* 489 F.3d 170, 177 (3d Cir.2007). However, I am not "compelled to accept unsupported conclusions and unwarranted inferences or a legal conclusion couched as a factual allegation" *Baraka v. McGreevey,* 481 F.3d 187, 195 (3d Cir.2007) (internal quotation marks and citations omitted). If the facts alleged are sufficient to "raise a right to relief above the speculative level" such that the plaintiffs' claim is "plausible on its face," a complaint will survive a motion to dismiss. *Bell Atlantic Corp.,* 127 S.Ct. at 1965, 1974; *Victaulic Co. v. Tieman,* 499 F.3d 227, 234–35 (3d Cir.2007).

## III. DISCUSSION

### A. Count I–Fair Debt Collection Practices Act

Plaintiffs seek relief from TAR through Section 808 of the Fair Debt Collection Practices Act [FDCPA]. 15 U.S.C. § 1692f(6)(A). Pursuant to the statute, a "debt collector may not ... tak[e] or threaten[ ] to take any nonjudicial action to effect dispossession or disablement of property if there is no present right to possession of the property claimed as collateral through an enforceable security instrument." *Id.* For the purposes of this section of the FDCPA only, the term debt collector includes "... any business the principal purpose of which is the enforcement of security interests." § 1692a(6). A repossession agency, such as TAR, is an enforcer of security interests. *See Jordan v. Kent Recovery Servs.,* Inc., 731 F.Supp. 652, 657 (D.Del.1990). There appears to be no real dispute that TAR falls within the ambit of the statute. Mot. to Dismiss 8.

**\*3** The issue for this motion to dismiss is whether DTL had a present right to possession of the vehicle. This point is critical because the FDCPA imposes no liability on a repossessor "who enforce[s] security interests when a 'present right' to the collateral exists...." *Jordan,* 731 F.Supp. at 657. Plaintiffs allege that the loan agreement is not legally enforceable because the 150% APR violates Pennsylvania Law. Noting that the contract provides that it shall be governed by Delaware Law, Defendants contend that, even if Pennsylvania law applies, the note is not void, and DTL had a present right of possession in the vehicle when plaintiffs were late on their payments for February and March 2012.

To resolve this dispute, I must first decide whether Pennsylvania or Delaware law governs the agreement. *Kaneff v. Delaware Title Loans, Inc.,* 587 F.3d 616, 621 (3d Cir.2009) ("[Plaintiff] argues that the contract is unconscionable under Pennsylvania law, a challenge that requires us to conduct a choice of law analysis inasmuch as Delaware law is specified in the contract."). In a federal question case, I look to the choice of law principles of the forum state to determine which state's law applies. *Gay v. CreditInform,* 511 F.3d 369, 389 (3d Cir.2007) (applying the rule of *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) to federal question cases). Accordingly, I will apply Pennsylvania's choice of law principles. In doing so, my analysis is controlled by the Third

Circuit's decision in *Kaneff* which interpreted an identical title loan agreement between a Pennsylvania borrower and DTL. [3] 587 F.3d at 621–624.

Under Pennsylvania choice of law principles, I must first determine if a true conflict exist. A 150% annual interest rate applies to the loan agreement between Mr. Gregoria and DTL. Such an exorbitant rate of interest is perfectly legal and enforceable in Delaware which has no usury laws. *Id.* at 622. On the other hand, Pennsylvania's Loan Interest and Protection Law [LIPL] provides that the maximum lawful rate of interest which an unlicensed lender may charge is 6%. 41 Pa.C.S. § 201. A Pennsylvania lender licensed under the Consumer Discount Company Act [CDCA] may charge an annual interest rate not to exceed 24%. 7 Pa.C.S. §§ 6213.E and 6217.1.A; *Cash Am. Net of Nevada, LLC v. Com., Dep't of Banking, 607 Pa. 432, 8 A.3d 282, 285 (Pa.2010).* Accordingly, the plaintiffs would not be obligated to pay the interest in excess of the applicable LIPL or CDCA rate in Pennsylvania. 41 Pa.C.S. § 501. [4] "There can be no question that there is a true conflict between Delaware and Pennsylvania in their approach to and treatment of usurious interest." *Kaneff, 587 F.3d at 622.*

Pennsylvania choice of contract law principles "generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Gay, 511 F.3d at 389* (citing *Kruzits v. Okuma Machine Tool, Inc., 40 F.3d 52, 55 (3d Cir.1994)).* Contractual choice of law provisions will be enforced unless:

> **\*4** (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which ... would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Kaneff, 587 F.3d at 621—22; Gay, 511 F.3d at 389.* The *Kaneff* Court noted that Delaware bore a substantial relationship to the transaction since the contract was signed in Delaware. Nonetheless, the Third Circuit overruled the choice of law provision in the DTL contract finding Pennsylvania's "antipathy to high interest rates ... represents such a fundamental policy that we must apply Pennsylvania law." *Id.* at 624. [5] Here, the same DTL contract is at issue, and the same policy against usurious interest rates is implicated. [6] Therefore, I will apply Pennsylvania law to interpret the loan agreement. [7]

The LIPL provides Pennsylvania borrowers with remedies against predatory lenders. As previously discussed, the LIPL and CDCA cap permissible interest rates at 6% and 24% respectively. 41 Pa.C.S. § 201; 7 Pa.C.S. §§ 6213.E, 6217.1.A. A borrower who is subject to a usurious interest rate may, upon notice to the lender, deduct the illegal portion of the interest from the borrower's scheduled payment. 41 Pa.C.S. § 501. However, the borrower must continue to make payments. *Id.* In the alternative, the borrower may sue the lender to recover the excess interest. Id § 502. Despite these protections, the LIPL does not invalidate, in its entirety, a loan agreement with a usurious interest rate. *Pennsylvania Dept. of Banking v. NCAS of Delaware, LLC, 995 A.2d 422, 440 (Pa.Cmwlth.Ct.2010).* A rate of interest in violation of the LIPL "renders the note [loan] not void, but only voidable as to the interest specified beyond the lawful rate." *Id.* (citing *Mulcahy v. Loftus, 439 439 Pa. 111, 267 A.2d 872, 873 (Pa.1970)).* Thus, a loan agreement containing an excessive interest rate is still enforceable to the extent of the lawful rate.

Mr. Gregoria's loan agreement with DTL remained in force under Pennsylvania law. The LIPL permitted Mr. Gregoria to withhold the illegal interest or to pay the interest and sue for its recovery. The LIPL did not authorize Mr. Gregoria to stop making payments or to make payments late. Plaintiffs admit they were late in making payments in February and March 2012. Compl ¶ 20. It is undisputed that failing to make the scheduled payments when due is an event of default under the agreement. Pls.' Resp. ¶ 3; Compl. Ex. P–4 ¶ 8(a). Upon plaintiffs' default, DTL was contractually authorized to "foreclose upon its lien and liquidate any [c]ollateral securing [the][a]greement according to law including by using self-help repossession." Compl. Ex. P–4 ¶ 9(b). Plaintiffs' 2006 Nissan Altima was the collateral securing the loan agreement. Pls.' Resp. ¶ 2; Compl. Ex. P–4 ¶ 2. Thus, DTL acquired a

2015 WL 115501, RICO Bus.Disp.Guide 12,569

present interest to repossess plaintiff's Nissan Altima when plaintiffs failed to make timely payment in February and March 2012. TAR repossessed plaintiff's vehicle as DTL's agent and cannot be held liable under the FDCPA. *Jordan, 731 F.Supp. at 657.* (finding that the FDCPA imposes no liability on a repossessor "who enforce[s] security interests when a 'present right' to the collateral exists ..."). I will dismiss plaintiffs' FDCPA claim.

## B. Count II—Racketeer Influenced and Corrupt Organizations Act

**\*5** Plaintiffs allege that Mr. Howard violated the Racketeer Influenced and Corrupt Organizations Act [RICO] by using TAR to collect an unlawful debt. The statute prohibits "... any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through ... collection of unlawful debt." *18 U.S.C. § 1962(c).* There is no dispute that plaintiffs have pleaded 1.) the existence of an enterprise; 2.) the defendant's employment with the enterprise; 3.) and that the defendant participated in the conduct or affairs of the enterprise. However, Mr. Howard denies he caused TAR to collect an unlawful debt.

An unlawful debt includes any "debt (A) ... which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with ... the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." *Id.* § 1961(6). Here, plaintiffs allege that part of the interest charged—at least 126%—was unenforceable under Pennsylvania's usury statutes.[8] Even assuming DTL is licensed under the CDCA, a triple digit interest rate is at least four times the enforceable rate.[9] Additionally, plaintiffs aver that DTL is a predatory lender which is in the business of issuing loans at triple digit interest rates to "people with poor credit and a crushing need for cash." Compl. ¶ 12; *see Durante Bros. & Sons v. Flushing Nat. Bank,* 755 F.2d 239, 250 (2d Cir.1985) (distinguishing occasional usurious transactions from the business of making usurious loans).[10] Considering my duty to read the RICO statute broadly to give full effect to its remedial purposes, *see Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 497–98

(1985), I find that these allegations are more than sufficient to plausibly plead a civil RICO claim.

Mr. Howard argues that he cannot be considered a debt collector under RICO. I am unpersuaded. First, he contends that he did not collect a debt. Rather, he only collected collateral. This is a distinction without a difference. DTL repossessed the car to "liquidate the collateral" to satisfy the unpaid balance of plaintiff's loan. Compl. Ex. P–4 ¶ 9(b). Whether the defendant collected the car or cash, the purpose of the collection was to satisfy the debt.[11] Second, Mr. Howard notes that neither he nor TAR is in the business of lending money. The complaint contains no allegation to that effect, but plaintiffs have alleged that DTL is in the business of lending money. While an unlawful debt must be "incurred in connection with ... the business of lending money," *18 U.S.C. § 1961(6),* the statute does not require the collector to also be the lender. *See 18 U.S.C. § 1962(c).* Finally, Mr. Howard asserts "courts have consistently found that repossession agencies are not considered 'debt collectors' under the FDCPA (except for purposes of [15 U.S.C.] § 1692f(6)(A))." However, § 1692f(6)(A) is the very section of the FDCPA implicated by the facts of this case. As I have already discussed, TAR is a debt collector for the purposes of § 1692f(6)(A). Therefore to the extent the FDCPA may be used to interpret RICO, the FDCPA would support RICO liability for a repossession company. I will deny defendant's motion to dismiss plaintiffs' RICO claim.

## C. Compulsory Joinder under **Federal Rule of Civil Procedure 19**

**\*6** **Federal Rule of Civil Procedure 19(a)** specifies the circumstances in which a party is necessary for the proper resolution of an action .[12] **Rule 19(b)** provides for the dismissal of a case when the joinder of a necessary party is not feasible because the party is not subject to service of process or joinder would destroy the court's subject matter jurisdiction. *See Gen. Refractories Co. v. First State Ins. Co.,* 500 F.3d 306, 312 (3d Cir.2007). I find that DTL is a necessary party, and that joinder of DTL is feasible. Accordingly, I will order plaintiffs to join DTL as a defendant. Since DTL's can be made a party, dismissal of this action is inappropriate. *See* FRCvP 19(b) ("If a person who is required to be joined ... **cannot be joined,** the court must determine whether the action ... should be dismissed.");

*Speakman Co. v. Harper Buffing Mach. Co.,* 583 F.Supp. 273, 278 (D.Del.1984) (citing 3A *Moore's Federal Practice* ¶ 19.052[2], at 19–91, 19–92 (2d ed. 1982)) ("Dismissal under Rule 19(b) is proper only if a person "cannot be made a party" under Rule 19(a).").

The first part of the analysis is to determine if DTL is a necessary party. I recognize that liability in a civil RICO action may be imposed on a joint and several basis. *See State Farm Mut. Auto. Ins. Co. v. Lincow,* 444 F. App'x 617, 621–22 (3d Cir.2011) ("... the nature of the RICO offense mandates joint and several liability."). I also appreciate that joint tortfeasors are not necessary parties for the purposes of Rule 19. *Temple v. Synthes Corp.,* 498 U.S. 5, 7–8, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990). However, it is equally clear that the rights and liabilities of the parties are premised on the loan agreement between DTL and plaintiffs. "[W]here rights sued upon arise from a contract all parties to it must be joined." *Ward v. Deavers,* 203 F.2d 72, 75 (D.C.Cir.1953); *see also* *Caribbean Telecommunications Ltd. v. Guyana Tel. & Tel. Co.,* 594 F.Supp.2d 522, 532 (D.N.J.2009) (citations omitted) ("It is well established that 'a contracting party is the paradigm of an indispensable party' for contract claims."). Accordingly, DTL is a necessary party.

Next, I must determine whether joinder of DTL is feasible. Here, it would appear that DTL's minimum contacts with Pennsylvania are sufficient to establish this court's jurisdiction over DTL. [13] DTL opened an office in Claymont, Delaware within one half mile of the Pennsylvania border. From this office, plaintiffs allege that DTL has extended title loans to many residents of Pennsylvania. When DTL forecloses on its lien, the effects on the borrower are felt in Pennsylvania. Given these allegations, the maintenance of suit in the Eastern District of Pennsylvania does not offend traditional notions of fair play and substantial justice. Since joining DTL to this federal question case will not destroy the court's subject matter jurisdiction, joinder of DTL is feasible.

**IV. CONCLUSION**

 **\*7**  For the foregoing reasons, I will dismiss plaintiffs' claim under the Fair Debt Collection Practices Act. I will deny Mr. Howard's motion to dismiss plaintiff's RICO claim, and I will order plaintiffs to join Delaware Title Loans as a party.

An appropriate order follows.

**ORDER**

AND NOW, this 7th day of January 2015, upon consideration of defendants' motion to dismiss (doc. no. 12), plaintiff's response (doc. no. 18), and the parties' reply (doc. no. 19) and surreply (doc. no. 24) thereto, **IT IS HEREBY ORDERED** that:

1. The motion to dismiss (doc. no. 12) is **GRANTED in part;**

2. Count I of the complaint is **DISMISSED with prejudice;**

3. Within 14 days of the entry of this order, plaintiff shall file an amended complaint naming Delaware Title Loans as a party to this action. If plaintiff fails to join Delaware Title Loans, this case will be dismissed with prejudice.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 115501, RICO Bus.Disp.Guide 12,569

**Footnotes**

1    Title 15 of the United States Code, Section 1692(e) provides that the purpose of this Act is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."

2    Title 18 of the United States Code, Section 1962(c) provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or

foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

3     Defendants attempt to distinguish *Kaneff* because the district court in *Kaneff* had diversity jurisdiction, whereas, this is a federal question case. Whether this is a federal question or diversity case has no impact on the choice of law analysis. *See* 🔖 *Gay,* 511 F.3d at 389. Since *Kaneff* is otherwise indistinguishable from the present case, I am compelled to follow *Kaneff* in my choice of law analysis.

Defendants believe that *Gay* stands for the proposition that a difference in a court's jurisdictional basis can change the choice of law analysis, but defendants misread *Gay.* In *Gay,* the plaintiff filed an action pursuant to the Credit Repair Organization Act, 15 U.S.C. §§ 1679, *et. seq,* but the underlying agreement included a Virginia choice of law provision. In analyzing the contract's choice of law provision, the *Gay* Court first decided that it must use Pennsylvania choice of law principles in conducting the choice of law analysis. In reaching its conclusion to apply Pennsylvania choice of law principles, the *Gay* Court noted: "[I]f the District Court's jurisdiction in this federal question case had been based on diversity of citizenship of the parties we would apply Pennsylvania's choice-of-law principles as the court was in the 🔖 Eastern District of Pennsylvania." 511 F.3d at 389 (citing 🔖 *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). By concluding that the forum's choice of law principles applied in *Gay* as well, the Third Circuit recognized that *Klaxon* applies with equal force in both diversity and federal question cases. Accordingly, a court's jurisdictional basis is not dispositive of the choice of law analysis.

4     "When a rate of interest for the loan or use of money, exceeding that provided by this act or otherwise by law shall have been reserved or contracted for, the borrower or debtor shall not be required to pay to the creditor the excess over such maximum interest rate and it shall be lawful for such borrower or debtor, at his option, to retain and deduct such excess from the amount of such debt providing the borrower or debtor gives notice of the asserted excess to the creditor." 41 Pa.C.S. § 501.

5     Other factor's supporting Pennsylvania law included: "it is where [plaintiff] lives.... Pennsylvania is also the location of the collateral, [plaintiff's] car, and DTL was required to enter Pennsylvania in order to repossess the car. Finally, ... Pennsylvania will have to live with the aftermath of the transaction." 🔖 *Kaneff,* 587 F.3d at 623.

6     Ultimately, the *Kaneff* Court ruled that the loan agreement's arbitration clause was enforceable under Pennsylvania law. Thus, defendants urge that the choice of law was not at issue and is dicta. I disagree. The Court's choice of law analysis which focused on the differing usury policies of Delaware and Pennsylvania was essential to its decision to compel arbitration. 🔖 *Kaneff,* 587 F.3d at 622 ("We do consider the usury issue as a part and parcel of whether the arbitration clause should be enforced. The choice of law analysis cannot be divorced from that issue."). Accordingly, the Court's choice of law analysis is not only persuasive —it has precedential effect. *See* 🔖 *In re Friedman's Inc.,* 738 F.3d 547, 552 (3d Cir.2013) (If a determination by our Court is not necessary to our ultimate holding, "it properly is classified as dictum.").

7     Defendants argue that, "it is not clear that Pennsylvania law would apply to this case." Mot. to Dismiss 6. Other than their unsuccessful attempt to distinguish *Kaneff,* defendants provide no guidance on why Delaware law should govern.

8     For the present motion, I find that these facts are sufficient to plead that the debt was incurred in connection with a business of lending money at a rate usurious under state law. However, RICO's definition of unlawful debt with reference to state law is problematic. DTL's lending practices are perfectly legal in Delaware, but they would be illegal in Pennsylvania where plaintiffs reside. Did Congress intend to impose RICO liability on a lender or debt collector based on the usury laws of the borrower's domicile? Do I resolve this conflict by traditional choice of law principles? In my opinion, this is the big legal question posed by the facts of this case, yet neither party briefed the subject. Therefore, I will treat the fact as uncontested for this motion.

9     If DTL is licensed under the CDCA, then it could legally charge interest at 24%. A triple digit interest rate is at least 100%; although, plaintiffs contend that the rate of interest is often 300%.

10    In contrast, Mr. Howard relies heavily on the following passage from *Durante Bros.:* "The civil RICO action is not simply an action to recover excessive interest or to enforce a penalty for the overcharge. RICO is concerned with evils far more significant than the simple practice of usury." 📖 755 F.2d at 248. To the extent Mr. Howard claims that DTL is only engaged in "the simple practice of usury," I am not persuaded. In *Durante,* plaintiff's sued Flushing National Bank for making usurious loans in violation of RICO. The Second Circuit struggled with whether the bank was in the business of making usurious loans or if there was a mere scheme to make a few isolated usurious loans. 📖 *Id.* at 250. In remanding the case, the Court noted that if the unlawful loans were isolated events rather than part of business practice the case could be dismissed on summary judgment. *Id.*

> Unlike the lender in *Durante,* DTL is not a nationally chartered bank. According to plaintiffs, DTL's sole business is to make usurious loans. Indeed, the complaint suggests that this **predatory** lender is the very loan **shark** which RICO was crafted to target. *See Id.* ("The inclusion of "collection of unlawful debt" as a major predicate for RICO liability seems to have been an explicit recognition of the evils of loan sharking, and there is no indication that Congress was taking aim at legitimate banking institutions."). Therefore, the complaint plausibly alleges that the unlawful debt was "incurred in connection with 'the business of' lending money at a usurious rate." 📖 *Id.* at 249.

11    I recognize that my analysis of the *collateral v. debt* issue parts company with three of my colleagues. *See Gonzalez v. DRS Towing, LLC, et al,* No. 12–5508 (E.D.Pa. Feb. 28, 2013); *Collins v. Siani's Salvage, LLC,* No. CIV.A. 13–3044, 2014 WL 1244057 (E.D.Pa. Mar.26, 2014); *Goldenstein v. Repossessors, Inc .,* No. 13–CV–02797, 2014 WL 3535112 (E.D.Pa. July 17, 2014). However, given the broad construction I must give the RICO statute and considering this is a motion to dismiss, I find that pleading repossession of collateral plausibly states a RICO claim.

12    Rule 19(a) defines a necessary party as:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or
> (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may
> (i) as a practical matter impair or impede the person's ability to protect that interest or
> (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest

13    A federal court may exercise personal jurisdiction over a nonresident defendant to the same extent provided by the law of the state in which the federal court sits. 🔶 *Time Share Vacation Club v. Atl. Resorts, Ltd.,* 735 F.2d 61, 63 (3d Cir.1984). Pennsylvania statute provides that a court in the Commonwealth may exercise jurisdiction "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa.C.S. § 5322(b). Accordingly, plaintiff must establish that defendant has minimum contacts with Pennsylvania "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.,* 566 F.3d 94, 102 (3d Cir.2009) (citing 📖 *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95, (1945)).

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 4068818
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

LUPIN PHARMACEUTICALS, INC., et al., Plaintiffs,
v.
Craig RICHARDS, Defendant.

Civil Action No. RDB–15–1281.
|
Signed July 2, 2015.

**Attorneys and Law Firms**

Anthony R. Van Vuren, Bryan M. Killian, Conrad W.
Bolston, Leiv Hamilton Blad, Morgan, Lewis & Bockius LLP,
Washington, DC, for Plaintiffs.

Clyde E. Sniffen, Jr., Alaska Department of Law, Achorage,
AK, David P. Baltmanis, Robert S. Libman, Miner, Barnhill
& Galland P.C., Chicago, IL, for Defendant.

***MEMORANDUM OPINION***

RICHARD D. BENNETT, District Judge.

**\*1** In this case, Plaintiffs Lupin Pharmaceuticals, Inc. [1]
("Lupin Pharmaceuticals") and Lupin, Ltd. ("Lupin India")
(collectively, "the Lupin Plaintiffs") seek to enjoin Defendant
Craig Richards, the Attorney General of Alaska, ("the
Attorney General") from issuing a civil investigative demand
("CID") to the Lupin Plaintiffs and from applying Alaskan
antitrust law to the Lupin Plaintiffs. The Attorney General has
moved to dismiss this action, arguing that this Court should
abstain from exercising its jurisdiction under the abstention
doctrine established in Younger v. Harris, 401 U.S. 37
(1971). The parties' submissions have been reviewed, and this
Court held a hearing on June 26, 2015 on the Motion. *See*
Local Rule 105.6 (D.Md.2014). For the reasons that follow,
Defendants Craig Richards' Motion to Dismiss (ECF No. 23)
is GRANTED, and this case is DISMISSED.

*BACKGROUND*

This Court accepts as true the facts alleged in plaintiff's
complaint. *See* Aziz v. Alcolac, Inc., 658 F.3d 388, 390

(4th Cir.2011). This dispute arose out of issues pertaining
to two drugs, Loestrin FE 24 and Effexor XR. These drugs
are manufactured and sold by Warner–Chilcott and Wyeth,
respectively, and those companies hold patents on the drugs.
*See* Compl., ¶ 16. The Lupin Plaintiffs allege that neither
Lupin Pharmaceuticals, Inc. nor Lupin, Ltd. [2] ("Lupin India")
had rights to sell the drugs or approval to sell generic
versions. *Id.* The Lupin Plaintiffs had filed applications with
the Food & Drug Administration ("FDA") in 2006 and 2009
to sell generic versions of the respective drugs, but the
brand manufacturers sued the Lupin Plaintiffs for declaratory
judgments stating that the sale of such generics would violate
their patents. [3] *Id.* at ¶ 17. The Lupin Plaintiffs settled the
patent claims in 2009 and 2010 respectively. *Id.* at ¶¶ 17–18.

On February 3, 2015, pursuant to Alaska Stats. §§ 45.50.592 [4]
and 45.50.495, Attorney General Richards issued separate
civil investigative demands (CIDs) to Lupin Pharmaceuticals,
Inc., and Lupin, Ltd., demanding production of three
categories of documents related to the two drugs. *Id.* at
¶ 21. The CIDs state that "[t]he Attorney General seeks
to determine whether the pharmaceutical manufacturers
subject to [the CID] violated Alaska state law by entering
into a settlement agreement that terminated ongoing patent
litigation regarding the brand name drug listed herein,
and thereby delaying generic entry into the marketplace,"
in potential violation of Alaska antitrust and consumer
protection statutes. *See* Mem. Supp. Mot. Dismiss 1–2,
ECF No. 23–1. The CIDs originally required production
of responsive documents within sixty days. *Id.* at 2. The
Lupin Plaintiffs allege that the scope of the CIDs included
filings with the Federal Trade Commission ("FTC") and
Department of Justice ("DOJ"), documents produced in the
patent litigations, documents discussing the validity of the
patents, and agreements between Lupin and the branded
manufacturers. Pls.' Compl. ¶ 21.

**\*2** Alaska law provides that the subject of a CID may
within 20 days of service file a petition in Alaska Superior
Court stating good cause why the CID should be modified
or set aside. Alaska Stat. § 45.50.592(f). The Lupin Plaintiffs
declined to file any petition requesting modification of the
CID. It is undisputed, however, that the Lupin Plaintiffs
requested to extend the time for compliance with the CIDs;
the Attorney General granted those requests. Thus, the
deadline to produce documents responsive to the CIDs was
May 4, 2015. Pls.' Compl. ¶ 23.

2015 WL 4068818

Instead of complying with or objecting to the CIDs, the Lupin Plaintiffs filed the present action on the May 4 deadline, and filed the Motion for Preliminary Injunction (ECF No. 4) on the following day. The Complaint requests that this Court immediately issue a permanent injunction restraining Defendant from issuing civil investigative demands (CIDs) to Plaintiffs in connection with the Attorney General's investigation of Plaintiffs' compliance with Alaskan Antitrust laws, and from applying those state laws to Plaintiffs. Plaintiffs also request a declaratory judgment that Defendant's issuance of CIDs to Plaintiffs in connection with the Attorney General's investigation of Plaintiffs' compliance with Alaskan antitrust laws regarding the drugs was unconstitutional. The Plaintiffs also seek attorneys' fees and damages.

On May 22, 2015, the Attorney General filed a motion for extension of time to respond, noting that the assistant attorney general assigned to the case (Clyde Sniffen, Jr.) was on vacation when this case was filed and that an extension was needed to allow time for Sniffen to "return from vacation on May 27, 2015 to review the pleadings in this case, confer with Attorney General Richards, and prepare a response to the motion for preliminary injunction." The motion was opposed by the Plaintiffs but was granted by this Court.

On June 1, 2015, the Attorney General filed a petition in Alaska Superior Court for an order to show cause why the Lupin Plaintiffs should not be held in contempt for failure to respond to the CIDs pursuant to *Alaska Stat. § 45.50.592(g).* [5] On June 1, 2015, the Attorney General also filed the subject Motion to Dismiss (ECF No. 23) and a Motion to Stay the Motion for Preliminary Injunction (ECF No. 24) in this Court.

This Court held a teleconference on June 3, 2015. As a result of that call, the Motion to Stay the Motion for Preliminary Injunction was granted, and this Court established a briefing schedule for the motion to dismiss. This Court held a hearing on the Motion to Dismiss on June 26, 2015.

### STANDARD OF REVIEW

A motion to dismiss under *Rule 12(b)(1) of the Federal Rules of Civil Procedure* for lack of subject matter jurisdiction challenges a court's authority to hear the matter brought by a complaint. *See Davis v. Thompson,* 367 F.Supp.2d 792, 799 (D.Md.2005). This challenge under *Rule 12(b) (1)* may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish

subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States,* 585 F.3d 187, 192 (4th Cir.2009) (citation omitted). With respect to a facial challenge, a court will grant a motion to dismiss for lack of subject matter jurisdiction "where a claim fails to allege facts upon which the court may base jurisdiction." *Davis,* 367 F.Supp.2d at 799.

**\*3** Where the challenge is factual, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns,* 585 F.3d at 192. "[T]he court may look beyond the pleadings and 'the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.' " *Khoury v. Meserve,* 268 F.Supp.2d 600, 606 (D.Md.2003) (citation omitted). The court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indon.,* 370 F.3d 392, 398 (4th Cir.2004); *see also Sharafeldin v. Md. Dep't of Pub. Safety & Corr. Servs.,* 94 F.Supp.2d 680, 684–85 (D.Md.2000). A plaintiff carries the burden of establishing subject matter jurisdiction. *Lovern v. Edwards,* 190 F.3d 648, 654 (4th Cir.1999).

### ANALYSIS

The main issue before this Court is whether this Court should abstain from exercising its jurisdiction over this case under the doctrine of *Younger v. Harris,* 401 U.S. 37 (1971). [6] Of course, federal courts have a "virtually unflagging" obligation to hear and decide those cases for which they have jurisdiction. *Sprint Communications, Inc. v. Jacobs,* ——U.S. ——, ——, 134 S.Ct. 584, 591, 187 L.Ed.2d 505 (2013) (citing *Colorado River Water Conservation Dist. V. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). Certain "exceptional circumstances," however, "justify a federal court's refusal to decide a case in deference to the States." *Id.* (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)). The first case involving such an "exceptional circumstance" was *Younger,* where the

United States Supreme Court held that considerations of federalism and comity required federal courts to abstain from exercising their equity jurisdiction to enjoin ongoing state criminal prosecutions. Subsequently, the Supreme Court found that such considerations also justified abstention where there were "state civil proceedings that [were] akin to criminal prosecutions" or state proceedings "that implicate[d] a State's interest in enforcing the orders and judgments of its courts."

*Sprint Communications, Inc. v. Jacobs,* —— U.S. ——, ——, 134 S.Ct. 584, 588, 187 L.Ed.2d 505 (2013). The Supreme Court's most recent opinion addressing *Younger* abstention—*Sprint Communications, Inc. v. Jacobs*—does not purport to diverge from the Court's previous *Younger* jurisprudence; however, the Court noted that its decision was intended "to guide other federal courts" and to "clarify and affirm that *Younger* extends to the three exceptional circumstances identified in [ *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) ], but no further." *Sprint,* 134 S.Ct. at 593–94 (internal quotation marks omitted).

The Attorney General asserts that the Alaska Proceeding warrants *Younger* abstention because it is both a civil enforcement proceeding akin to a criminal prosecution (i.e., the second *Younger* category) and a state proceeding that implicates the State's interest in enforcing the orders and judgments of its courts (i.e., the third *Younger* category). The Lupin Plaintiffs characterize the Alaska Proceeding as a discovery dispute that does not qualify under either the second or third *Younger* categories. Because this Court finds that this case clearly qualifies for the third category of *Younger* abstention, this Court need not reach the issue of whether this case also satisfies *Younger'* s second category.

### A) The Alaska Proceeding Implicates the State's Interest in Enforcing the Orders and Judgments of its Courts

**\*4** In *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), the Supreme Court found that abstention under *Younger* was appropriate in a federal class action suit brought by individuals who had been found in contempt by state court judges for disobeying subpoenas. The Court recognized that the same principles of federalism and comity that were emphasized in *Younger* also applied to cases involving a State's contempt process because "federal-court interference with the State's contempt process is an offense to the State's interest ... likely to be every bit as great as it would

be were [it] a criminal proceeding." *Juidice,* 430 U.S. at 335–36 (internal quotation marks omitted).

The Lupin Plaintiffs attempt to distinguish this case from *Juidice* on the basis of the type of subpoena at issue. In *Juidice,* the Supreme Court was faced with contempt proceedings arising out of an individual's failure to respond to a subpoena in a civil action between private parties. In this case, the civil investigative demands—essentially subpoenas—are administrative in nature. Specifically, AS § 45.50.592 authorizes the Attorney General to issue CIDs when the Attorney General believes a party may have documentary evidence believed to be relevant to an authorized antitrust investigation. Petitions pertaining to such demands "may be filed in the superior court for the judicial district in which the person on whom the demand is served resides." AS § 45.50.592(f).

The Lupin Plaintiffs acknowledge that courts have found that *Younger* abstention is appropriate in the face of similar civil investigative demands,[7] but argue that those cases were "eviscerate[d]" by the Supreme Court's opinion in *Sprint.* Pls .' Resp. at 8. The Lupin Plaintiffs argue that this case is instead analogous to *Google v. Hood,* —— F.Supp.3d ——, 2015 WL 1546160 (S.D.Miss. Mar.27, 2015), and that *Younger* abstention does not apply. In the *Google* case, the district court found that a subpoena issued under the Mississippi Consumer Protection Act by a state's attorney general did not fit into any of the three *Younger* types of cases. In reaching that conclusion, however, the district court noted that there was no pending attempt to enforce the subpoena.[8] *Id.* at \*6 ("At this time, there is no ongoing state criminal prosecution relating to this matter, nor are there civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions."). Thus, the *Google* case is immediately distinguishable because the attorney general in that case never sought to enforce the subpoena through an action in the state court. In this case, the Attorney General has already filed a proceeding in Alaska Superior Court, thereby triggering judicial oversight of the CIDs. In this respect, therefore, the Lupin Plaintiffs' argument reveals itself as a mere distinction without a difference. The subpoenas at issue in *Juidice* were not issued by a court itself; instead, they were issued by a private party's attorney acting "as an officer of the court." 430 U.S. at 329 n2. Similarly, the CIDs in this case are issued by the Attorney General, but like in *Juidice,* can only

be enforced after involving a state court. Accordingly, this Court finds that *Juidice* requires this Court to abstain under the third category of the *Younger* Doctrine.[9]

### B) The Alaska Proceeding as a Parallel Action

**\*5**  The Lupin Plaintiffs next argue that "this Court should not abstain in favor of the show cause petition because it is not a truly parallel state proceeding that raises the constitutional questions that Plaintiffs have presented in their federal complaint."[10]  Pl.'s Resp. 12–13, ECF No. 32. The Lupin Plaintiffs argue that the proceeding will be restricted to whether the Lupin Plaintiffs willfully disobeyed the CIDs and that "it appears unlikely that the Alaska superior court will decide the *defense* that the AG lacked constitutional authority to issue the CIDs to Plaintiffs." *Id.* at 13. The Lupin Plaintiffs assert that the Alaska statute only expressly allows improper service of the CID to be raised and prohibits defenses going to a CID's validity; thus, the Lupin Plaintiffs argue that their challenge to the Attorney General's jurisdictional authority to even issue the CIDs to the Lupin Plaintiffs is an issue that will not be reached.

The Lupin Plaintiffs' speculation about the purported inadequacy of the Alaska proceeding fails to prevent the application of *Younger* abstention in this case. The Supreme Court has explained that "the burden ... rests on the federal plaintiff to show that state procedural law bar[s] presentation of its claims." *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 14, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (internal quotation marks omitted). "[W]hen a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." *Id.* at 15. The Lupin Plaintiffs have not cited to any case authority from Alaska that suggests constitutional or jurisdictional challenges cannot be raised in response to the show cause petition. Indeed, such limitations is unlikely because the Alaska Superior Court is the court of general jurisdiction in the State. Accordingly, while the statute is somewhat ambiguous as to the full gambit of defenses that may be raised during a show cause petition arising out of a CID, the Lupin Plaintiffs have failed to present unambiguous authority that would justify a conclusion by this Court that an Alaskan state judge would "interpret ambiguities in state procedural law to bar presentation of federal claims." *Id.*

### C) The Timing of the State and Federal Actions

The Lupin Plaintiffs next argue that abstention is inappropriate because, in its view, there have been proceedings on the merits in this case, and the Attorney General did not file the Alaska Proceeding until after the Lupin Plaintiffs filed their Motion for Preliminary Injunction in this Court. Citing to *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 238, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), the Lupin Plaintiffs argue that their motion for preliminary injunction "put the merits of the Plaintiffs' case in play." Pl.'s Resp. at 15. However, in *Midkiff,* the district court had granted an injunction—i.e., there was a ruling on the issues raised by the parties. In this case, however, the Court has not made any substantive rulings to date; therefore, there is no basis for this Court to refuse to abstain based upon proceedings on the merits in federal court.

### D) Exceptions to the *Younger* Doctrine

**\*6**  The Lupin Plaintiffs also argue that several of the exceptions to the *Younger* Doctrine apply to this case. Indeed, the Supreme Court has recognized a few exceptions to *Younger* abstention. These exceptions include state proceedings initiated in bad faith or for purposes of harassment. Additionally, an exception exists where a statute is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Younger,* 401 U.S. at 53–54.

### 1) The Lupin Plaintiffs' Alleged Irreparable Loss of Constitutional Claims

The Lupin Plaintiffs assert that, through this action, they seek to "vindicate their constitutional right to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." Pls.' Resp. at 16 (internal marks omitted). In *Younger,* the Court alluded to the possibility of an exception for irreparable injury that is "both great and immediate." *See* 401 U.S. at 46. The Court clarified, however, that such a threat of injury to federally protected rights "must be one that cannot be eliminated by [the] defense against a single criminal prosecution," and that "the cost, anxiety, and inconvenience" of responding to a proceeding were insufficiently severe to prevent abstention. *Id.*

In this case, the concerns raised by the Lupin Plaintiffs —although undoubtedly relating to jurisdictional issues—

boil down to harms arising from responding to the Alaska Proceeding itself. As discussed above, the Lupin Plaintiffs have failed to demonstrate that they have no way of vindicating their rights through the Alaska Proceeding and, thus, they have failed to show that the threatened harm constitutes an irreparable injury for purposes of *Younger*.

### 2) The Alleged Retaliatory Nature of the Alaskan Proceeding

The Lupin Plaintiffs argue that the Attorney General's show-cause petition is retaliatory because such a petition is warranted under Alaska law only when a recipient "willfully disobeys" a CID, but not when a recipient merely "challenges" a CID. *See* Mot. in Opposition, ECF No. 32. The question then becomes whether filing the present motion for injunctive relief constitutes a response to the CID under § 44.62.590(a)(2).

Plaintiffs argue that § 45.50.592(f), the provision outlining how a recipient may challenge a CID without being in contempt, could be interpreted to permit the present motion as a "response" for the purposes of § 44.62.590(a)(2). The statute reads in relevant part "a petition to extend the return date for, or to modify or set aside a demand issued under (a) of this section, stating good cause, *may be filed in the superior court for the judicial district where the parties reside."* Alaska Stat. Ann. § 45.50.592(f) (emphasis added). The Lupin Plaintiffs contend that because the statute does not expressly foreclose the possibility of filing a challenge to a CID in a federal district court of a different state, the present action must be construed as a valid "response," and not a refusal that would justify the Attorney General's show-cause petition. This argument is unpersuasive, as the context of the statute indicates contemplation of a "superior court," the common denomination of an intermediate court in Alaska, not a federal court established under Article III of the U.S. Constitution. At best, such interpretive creativity hardly reveals the show-cause petition to be "bad faith" or "retaliatory" as alleged by the Lupin Plaintiffs.

### 3) The Alleged Waiver of the Abstention Issue

**\*7** Plaintiffs next contend that by virtue of the Attorney General's motion for an extension to respond to Plaintiffs' motion for preliminary injunction, the Attorney General waived any claim for *Younger* abstention. In support,

Plaintiffs cite to 📄 *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). In *Ohio Civil Rights Comm'n,* the Supreme Court held that the United States District Court for the Southern District of Ohio properly abstained under *Younger* from enjoining the Ohio Civil Rights Commission from exercising jurisdiction over a sex discrimination complaint brought by a discharged teacher. *Id.* In dicta, the Supreme Court explained that a State may "voluntarily submit to federal jurisdiction even though it might have had a tenable claim for abstention," but noted that these were cases where "the State expressly urged this Court or the District Court to proceed to an adjudication of the constitutional merits." 📄 *Id.* at 626. Requesting adjudication is hardly analogous to filing a motion for an extension to respond to a Complaint. Quite simply, the Attorney General did not forfeit any argument under *Younger* by merely requesting an extension of time to respond.

### CONCLUSION

For the reasons stated above, Defendant Craig Richards' Motion to Dismiss (ECF No. 23) is GRANTED, and this case is DISMISSED.

A separate Order follows.

### ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this 2nd day of July, 2015, ORDERED that:

1. Defendant Craig Richards' Motion to Dismiss (ECF No. 23) is GRANTED, and this case is DISMISSED;

2. The Clerk of the Court transmit copies of this Order and accompanying Memorandum Opinion to Counsel; and

3. The Clerk of the Court CLOSE THIS CASE.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4068818

# Footnotes

1    Lupin Pharmaceuticals, Inc is a Virginia corporation with its headquarters and principal place of business located in Baltimore, Maryland. Pls.' Comp. ¶ 10. Lupin Pharmaceuticals distributes prescription medications to American customers and is a wholly owned subsidiary of co-Plaintiff Lupin, Ltd. ("Lupin India"). *Id.*

2    Lupin India is incorporated in India and has its headquarters and principal place of business in Mumbai, India. Pls.' Compl. ¶ 11. Lupin India develops and manufactures branded and generic drugs in India.

3    Specifically, the Lupin Plaintiffs alleged:

    Neither LPI nor Lupin India has ever sold Loestrin or Effexor nor have they ever obtained approval from the Food and Drug Administration ("FDA") to sell generic versions of those products. On September 30, 2006, Plaintiffs filed with the FDA an Abbreviated New Drug Application ("ANDA") seeking FDA approval of a generic version of Effexor. On March 13, 2007, Wyeth, the branded manufacturer of Effexor, sued SPI for a declaratory judgment that LPI's generic version of Effexnor would infringe Wyeth's patent. Wyeth and LPI settled the litigation on May 11, 2009.

    ... On July 30, 2009, LPI filed an ANDA seeking FDA approval of a generic version of Loestrin. On September 9, 2009, Warner–Chilcott, the branded manufacturer of Loestrin, sued LPI for a declaratory judgment that LPI's generic version of Loestrin would infringe Warner Chilcott's patent. Warner–Chilcott and LPI settled the litigation on October 10, 2010.

    Pls.' Compl. ¶¶ 17–18.

4    Section 45.50.592 states in full:

    (a) If the attorney general determines that a person is in possession, custody, or control of documentary evidence, wherever situated, that the attorney general believes to be relevant to an investigation authorized in AS 45.50.590, the attorney general may execute in writing and cause to be served on that person an investigative demand requiring the person to produce the documentary material, and permit inspection and copying.

    (b) Each demand must

    (1) state the specific statute the alleged violation of which is under investigation, and the general subject matter of the investigation;

    (2) describe, with reasonable specificity so as fairly to indicate the material demanded, the documentary material to be produced;

    (3) prescribe a return date within which the documentary material is to be produced; and

    (4) identify the state employees or representatives to whom the documentary material is to be made available for inspection and copying.

    (c) A demand may not

    (1) require the production of documentary material that would be privileged from disclosure if demanded by a subpoena duces tecum issued by a court of the state; or

    (2) contain a requirement that would be unreasonable or improper if contained in a subpoena duces tecum issued by a court of the state; however, this does not limit the power of the attorney general to require production of documents located outside the state that pertain to matters affecting the state.

    (d) The demand may be served by the attorney general or the designee of the attorney general by

    (1) delivering a copy of it to the person to be served or, if the person is not a natural person, to an officer of the person to be served;

    (2) delivering a copy of it to a place of business in the state of the person to be served; or

    (3) mailing by registered or certified mail a copy of it addressed to the person to be served at a place of business in the state or, if the person has no place of business in the state, to the principal office or place of business of the person.

    (e) Documentary material produced pursuant to a demand, or copies of it, unless otherwise ordered by a superior court for good cause shown, may not be produced for inspection or copying by, nor may its contents be disclosed to, anyone other than an authorized employee of the state without the consent of the

person who produced the material. However, under those reasonable terms and conditions the attorney general prescribes, copies of the documentary material shall be available for inspection and copying by the person who produced the material or an authorized representative of that person. The attorney general, or a designee, may use copies of the documentary material as the attorney general or designee considers necessary in the enforcement of AS 45.50.562–45.50.598, including presentation before a court; however, material that contains trade secrets may not be presented except with the approval of the court in which the action is pending after adequate notice to the person furnishing the material.

(f) At any time before the return date specified in the demand, or within 20 days after the demand has been served, whichever period is shorter, a petition to extend the return date for, or to modify or set aside a demand issued under (a) of this section, stating good cause, may be filed in the superior court for the judicial district where the parties reside. A petition by a person on whom a demand is served, stating good cause, to require the attorney general or another person to act in accordance with the requirements of (e) of this section, and all other petitions in connection with a demand, may be filed in the superior court for the judicial district in which the person on whom the demand is served resides.

(g) A person on whom a demand is served under this section shall comply with the terms of the demand unless otherwise provided by an order of court issued in response to a petition filed under (f) of this section. A person who, with intent to avoid, prevent, or obstruct compliance, in whole or in part, with an investigative demand under this section, removes from any place, conceals, withholds, or destroys, mutilates, alters, or by any other means falsifies, documentary material in the possession, custody, or control of a person that is the subject of a demand duly served on any person, or who otherwise wilfully disobeys any such demand, is guilty of a misdemeanor, and is punishable upon conviction by a fine of not more than $5,000, or by imprisonment for a term of not more than one year, or by both. Failure of the state to serve the demand properly under (d) of this section is a defense to prosecution under this subsection, but invalidity of the demand under (b) or (c) of this section is not a defense, and that invalidity may be tested only in an action under (f) of this section to modify or set aside the demand.

(h) Nothing in this section impairs the authority of the attorney general or a designee to lay before a grand jury of this state evidence concerning a violation of AS 45.50.562–45.50.596, to invoke the power of a court to compel the production of evidence before a grand jury, or to file a civil complaint or criminal information alleging a violation of AS 45.50.562–45.50.596.

5    The Court refers to this case as "the Alaska Proceeding."

6    This Court recognizes that the Defendant Attorney General raised several other issues in its motion to dismiss, including arguments pertaining to failure to state a claim under Rule 12(b) (6) under the Dormant Commerce Clause of the United States Constitution, *see* U.S. Const. art. 1, § 8, cl.3, ripeness doctrine, absolute prosecutorial immunity, and qualified immunity. These issues were fully briefed, although the majority of the parties' papers focused on the abstention issue, and argument at the June 26, 2015 hearing was limited to the abstention issue as well. Because this Court finds that *Younger* abstention is proper, this Court does not reach these other issues raised by the parties.

7    These cases include *Temple of the Lost Sheep, Inc. v. Abrams,* 761 F.Supp. 237, 242–43 (E.D.N.Y.1989), and *Cuomo v. Dreamland Amusements, Inc.,* 2008 WL 4369270, at *10 (S.D.N.Y. Sept.22, 2008).

8    Notably, the district court also found that the subpoena had been issued in bad faith by the attorney general in response to Google's refusal to comply with certain requests made by the attorney general concerning Google's services.

9    In light of this Court's holding with respect to the third *Younger* category, this Court sees no need to address the issue whether the Alaska Proceeding qualifies as a civil enforcement action akin to a criminal prosecution under the second *Younger* category.

10   The Lupin Plaintiffs' argument on this point refers to three factors recognized in *Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982):(1) whether there is an ongoing state judicial proceeding; (2) whether the proceedings implicate important state interest; and (3) whether there is an adequate opportunity in the state proceedings to raise constitutional

challenges. *See* 🚩 *id.* at 432. In *Sprint,* the Supreme Court clarified that these factors were *"additional* factors appropriated considered by the federal court before invoking *Younger"* rather than "dispositive" conditions. *See* 🚩 134 S.Ct. at 593.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---